**JOSEPH B. COOPER & SON, Inc. v. UNITED STATES.**

No. 12524.

United States Court of Appeals Fifth Circuit.

May 19, 1949.

---

[2] 38 Stat. 733, c. 323, § 9, then in effect as former 18 U.S.C.A. § 412 [now § 660].

[3] 18 U.S.C.A. § 660.

SIBLEY, Circuit Judge, dissenting.

———————

Copal Mintz, New York City, for appellant.

Fred Botts, Asst. U. S. Atty., Miami, Fla., for appellee.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

McCORD, Circuit Judge.

This is a libel proceeding for forfeiture of certain property of appellant, consisting of platinum wedding and engagement rings weighing 84.80 ounces, which was seized as about to be unlawfully exported from the United States, in violation of Section 6 of the Act of July 2, 1940, 50 U.S.C.A. Appendix, § 701; 22 U.S.C.A. § 401 et seq.

The question presented is whether the trial court properly found that the shipment of rings constituted an attempt to evade a statutory prohibition against the unlicensed export of platinum metal then in effect, so as to make the penalty of forfeiture available to the Government.

The evidence reveals that during the early part of the war appellant, a New York manufacturer and dealer in precious metals and jewelry, delivered to the Railway Express Agency a wooden box containing 191 platinum wedding rings and 107 platinum engagement rings, for transportation to Miami, Florida, there to be cleared through the Collector of Customs and transported by air to one Dr. Seymour Estrin, Rio de Janeiro, Brazil. When the shipment arrived at Miami it was presented for physical inspection, whereupon clearance was refused, and the Collector thereafter seized the property and procured a warrant for its detention.

It is practically without dispute that the export controls and restrictions in force at the time the shipment of rings was seized required that a special license be issued for the export of pure platinum, an essential war metal, although "jewelry findings, parts and materials" were allowed to be exported with only a general export license, under which appellant was operating; that appellant had made several applications to secure a special license for the export of pure platinum prior to the time this shipment of pure platinum rings was seized, and that all such applications were denied; that at least one other shipment of pure platinum rings similar to the one under seizure had been shipped and exported without detection by the Customs authorities before the shipment in question was seized; that all of the rings seized were, without exception, manufactured from pure platinum metal, and that pure platinum, according to the usual custom and practice of the jewelry trade, is rarely used in the manufacture of jewelry because in its pure and unadulterated form it is too soft for practicable commercial use. The evidence further establishes that many of the wedding rings were so heavy, and of such gauge, size, and composition, as to be practically unsuitable for refinishing into salable articles of jewelry, even had they not been manufactured from pure platinum; that, in any event, they could not normally be sold and used as jewelry, and were not ordinarily suited for such purpose, unless and until they were melted down, alloyed with some other metal, such as iridium, to increase their hardness and durability, remanufactured and finished. In this connection, however, it was shown that the engagement rings were in such form that they would have been suitable for commercial use as jewelry but for their pure platinum content.

There is further testimony to the effect that Dr. Estrin, in Brazil, to whom the rings were being exported, had placed other orders with appellant for pure platinum

rings, at least one of which had been fulfilled and delivered without detection by the customs officers; that he knew appellant, the shipper and then his father-in-law, had several times been denied applications for a license to ship pure platinum out of the United States, and that he accordingly directed appellant to send him pure platinum rings instead; that Dr. Estrin placed these orders with appellant to fulfill requests and orders from certain jewelers in Brazil for pure platinum, rather than for platinum in the form of rings;[1] and that pure platinum was rarely used in the jewelry trade in Brazil, as well as in the United States.

The trial court, sitting without a jury, found that although appellant Cooper "was entirely forthright in the matter" and "innocent of wrong intentions", that his consignee, Dr. Estrin, had nevertheless rendered the entire shipment subject to forfeiture by ordering pure platinum in the form of rings to fulfill orders for platinum in

bars; that Dr. Estrin was an agent of appellant, and therefore Estrin's design and intention to thereby evade the export laws were chargeable to appellant, so as to justify the forfeiture.

■ We are of opinion there is substantial evidence to sustain the finding that the attempted shipment was a bad faith effort and subterfuge to export pure platinum without the required license, in violation of the statute. Title 22 U.S.C.A. § 401 et seq.; Title 50 U.S.C.A.Appendix, § 701; United States v. 21 Pounds, 8 Ounces of Platinum, 4 Cir., 147 F.2d 78; United States v. 67,200 Pounds Lithopone, D.C., 54 F.Supp. 895; United States v. 251 Ladies Dresses et al., D.C., 53 F.Supp. 772; United States v. One Ford Coupe Automobile, D.C., 54 F.Supp. 852; United States v. One Chrysler Sedan, D.C., 65 F.Supp. 451; Cf. United States v. Rosenberg, 2 Cir., 150 F.2d 788. As the court stated in United States v. 21 Pounds, 8 Ounces of Platinum, 4 Cir., 147 F.2d 78, at page 81: "Not only does § 410 (of the

[1] The following excerpts from the testimony of Kordos Kalman, a Brazilian jeweler, who testified by deposition, show conclusively that platinum by weight, and not in the form of rings, was ordered from Dr. Estrin:

"Q. Did Dr. Estrin ever solicit or request you to have any business dealings with him? A. Yes. * * * Besides the repair work which was done at my shop in jewelry belonging to the wife of Dr. Estrin, I bought from him more or less 350 grams of pure platinum. Afterwards he offered to sell me platinum and I placed a verbal order for one kilo of platinum which I never received.

"Q. * * * will you please state the form in which the platinum was to be purchased, that is whether in the form of bars, plates, ingots, rings, or in whatever form might be the case. A. In the form of rings. * * *

"Q. Did you ever at any time negotiate for or agree to purchase from or through Dr. Estrin any platinum in the form of manufactured or semi-manufactured rings? A. The purchase was made in the form of rings, and the order was placed for the supply of platinum in bars.

"Q. * * * If there was more than one transaction, please describe separately each transaction, whether or not the same was completed by delivery of the platinum. A. The first transaction of purchase was completed; the second transaction was not completed as the material ordered was not delivered.

"Q. * * * will you please state whether or not Dr. Estrin ever gave you any explanation as to his inability to deliver? A. Dr. Estrin gave me no explanation regarding the non-delivery of the material ordered and disappeared. * * *

"Q. * * * will you please state whether or not the rings so received by you or any of them were melted down into platinum bars or ingots or other form of bulk or semi-manufactured or unworked platinum? A. Some of the rings I used in the form of rings, and whenever I needed platinum for other work, I melted said rings. * * *

"Q. Did you ever suggest to Dr. Estrin in substance or effect that if pure platinum could not be secured in bars that you would like to secure some pure platinum in the form of rings? * * * A. I do not recall, however what I wanted was the material in any form posible. * * * I simply ordered the platinum without specifying the form. * * * I did not order rings; I only ordered one kilo of pure platinum which I did not receive, more or less during the first half of 1942. * * * I did not order a shipment of platinum rings, I only ordered one kilo of platinum. * * * No, I did not order rings. * * * I ordered pure platinum, but if there would be furnished to me platinum rings I would have accepted, because I needed the material. * * *"

Act) [now 18 U.S.C.A. § 968] make the unlawful exportation a criminal offense, punishable by fine and imprisonment, but § 401 declares that the property shall be forfeited to the United States if, upon due inquiry, as provided in the Act, the property seized shall appear to have been about to be unlawfully exported. No one can doubt that forfeiture is provided as a penalty and preventive measure additional to the criminal sanction of the Act."

There is circumstantial evidence in the record which tends even to refute appellant's claim of good faith in the illegal shipment, although, in view of the conflicting evidence, the question of good faith was properly an issue for the trial court, and we are not disposed to disturb his findings in this regard. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. However, the practically uncontradicted and unimpeached testimony of the witness Kordos Kalman, corroborated at least in part by that of E. V. Meacham and other government witnesses in Brazil, is sufficient to establish the intention of Dr. Estrin to evade the statute by ordering a shipment of pure platinum in the form of rings, and the evidence leaves us in no doubt that appellant is legally chargeable with Estrin's action.[2]

A careful examination of the entire shipment of rings, which is before us as an exhibit in the case, discloses that the heavy wedding bands were logically never intended for commercial use as jewelry. Moreover, we find no merit in the contention that merely because a number of the engagement rings are readily adaptable for commercial use as jewelry in their present form, that they should not be subjected to forfeiture along with the major bulk of the contraband shipment. Such argument entirely overlooks the indisputably established fact that the engagement rings were pure platinum, and that pure platinum is almost never used in the manufacture of jewelry intended for sale. The fact that these engagement rings were in a form which made the ultimate purpose of evading the law less easy of detection, and less likely to be suspected, is not so much evidence of good faith, as of cunning intended to conceal the fraud. Under all the evidence, we conclude the entire shipment was properly held subject to forfeiture. Cf. United States v. One Ford Coupe Automobile, D.C., 54 F. Supp. 852; United States v. One 1942 Model Dodge Sedan, D.C., 66 F.Supp. 758; United States v. One Ford Coupe, D.C., 66 F.Supp. 713; United States v. Morachis, 10 Cir., 154 F.2d 918; United States v. 251 Ladies Dresses et al., D.C., 53 F.Supp. 772.

We find no reversible error in the record, and the judgment is accordingly

Affirmed.

SIBLEY, Circuit Judge (dissenting).

I do not think the condemnation of all these rings, valued at $6,449, is either just or according to law. The evidence is not in conflict, and the main facts not in dispute. Joseph B. Cooper, who owns the claimant corporation, and who testified in person, has since 1913 been in the business in New York City of smelting and refining precious metals and furnishing them and jewelry findings to the jewelry trade. He did a business of over $3,000,000 per year, but little or no exporting. His son aided him and was secretary of the claimant. In 1942, just after the transaction in question, the son enlisted in the Navy and was not available as a witness at the trial. Dr. Estrin, the consignee of the rings, was the son-in-law of Cooper, a young physician who went in 1940 to Rio de Janeiro, Brazil, to perfect himself in the treatment of tropical diseases. He did not "disappear" in 1942, but came home and enlisted in the Navy and was somewhere in the Pacific at the time of trial. He was not making a

---

[2] Although appellant, Joseph Cooper, emphatically denied the agency of his son-in-law, Dr. Estrin, for the illegal exportation and resale of the platinum rings, appellant's firm nevertheless refers to him as "Our agent Dr. Seymour Estrin"; and later, "The fact that our representative has only recently arrived in Brazil", etc. In addition, the witness Kalman testified as follows:

"Q. * * * will you please state whether or not Dr. Estrin informed you that he proposed to secure said rings from Joseph B. Cooper & Son, Inc. A. Dr. Estrin informed me that this firm would supply the platinum ordered by me. * * * *".

living in Rio, and learning that platinum was in demand by jewelers there at a price above the price in New York he got his father-in-law to agree to sell him platinum and platinum goods at cost for resale to the jewelers, Estrin to have all profits. Cooper testified repeatedly and positively that Estrin was not his agent, that his corporation had never exported anything to Brazil and did not wish to, had no interest in Estrin's activity or gains, and he was only trying to help Estrin along. There is no contradiction of this. Young Cooper did in a communication to the Export Control Office refer to Estrin as "our representative", but at the same time stated that Estrin had just gone to Brazil to study tropical diseases, and when later interrogated about Estrin by the customs officers stated the facts as Cooper swore to them, and that Estrin was not really the Corporation's business agent.

The finding of the district judge is: "I hold that Dr. Estrin was an agent of respondent, and while Mr. Cooper I hold was entirely forthright in the matter, yet this shipment in question was intended to fill an order for platinum in bars. * * * It is (a case) where the order was in part at least, I hold, to fill an order for platinum, and was filled by rings, though I believe Mr. Cooper innocent of wrong intentions." Mr. Cooper was thus acquitted, but his property confiscated on a supposed agency of Estrin.

I do not think the testimony authorizes a finding of agency. The judge finds the only witness, Cooper, to be "entirely forthright", and Cooper swears Estrin was not an agent in the business. Slight circumstances are consistent with an agency, but they are also consistent with Estrin's doing business in Rio for himself, and the circumstances must yield to positive testimony on the point. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819.

The "order" referred to by the judge is one that the Government's witness Kalman says he gave Estrin verbally in 1941 for a kilo of platinum which was never filled, though Estrin delivered him some platinum rings, and he would have accepted these rings if delivered. The facts are that Estrin in 1941 obtained several orders for

bulk platinum and asked Cooper to fill them. Cooper, acting "forthrightly", sought to get licenses for export, and they were refused. Estrin then got a jewelry catalogue and ordered three shipments of rings similar to those in controversy. Cooper had them made up, getting the machine and handwork done by others. Two of these shipments were permitted by the customs, and one apparently reached Kalman and was accepted and paid for. No one says however that it was tendered and accepted on the order for a kilo of platinum. Those were rings, some nearly finished and some unfinished, as these are. Kalman testifies that he is a jeweler in Rio and finisher of semi-manufactured rings according to orders, so engaged for twenty years; he never manufactured wedding rings of pure platinum except when demanded by his clientele; owing to shortage of materials in 1941 and 1942 there was a demand for pure platinum wedding rings, and roughly fashioned ones if available; in March and April, 1942, due to shortage of labor, it was more common to manufacture rings from the semi-finished article, and owing to shortage of material, there was a demand also for pure platinum engagement rings, as well as for platinum alloy, which latter is preferable. As to the rings he accepted, which were pure platinum, he testified, "Some of the rings I used in the form of rings, and whenever I needed platinum for other work I melted the rings." Asked if he so informed Dr. Estrin he said, "No. The platinum was mine and I had no obligation to report to Dr. Estrin"; and as to whether Dr. Estrin had suggested getting pure platinum by making it up in circular form as a ring, his answer was "No. Dr. Estrin did not make this suggestion to me."

If Dr. Estrin was an agent of Cooper, I do not think the export regulations were violated by Estrin's ordering out these rings, which required no export license, in the hope of selling them to this and other jewelers. The regulations expressly permit the free export of "Jewelry findings, parts and materials", evidently intended not to break up the jewelry trade.

Cooper testifies " 'Findings' means all parts required to make a jewelry not completed, separate parts unassembled." These

rings, viewed by all the judges, are such. The engagement rings are fully made and polished, except that the claws for the setting are not separated and the hole for the setting not drilled. There is testimony that the claws ought to be alloyed, especially for a diamond. This change and the insertion of the desired stone the jeweler would attend to. The wedding rings were complete but not polished. Kalman says his use of such unfinished rings had become usual in Rio. He says also pure platinum was unusual, but he sold some of such rings he had received. The regulations say nothing about purity. Bulk platinum, pure or impure, requires a special license. Platinum jewelry, etc., pure or impure, does not. I do not think the use that may be made in the foreign country is a factor in the regulations, but if it is, the use here contemplated was sale to jewelers in their jewelry business, the exported goods to be finished or otherwise used in the jewelry business. I see no violation of the license regulations in that.

If it be unlawful to ship these rings because the final purchasers might melt the wedding rings down, that reason does not extend to the engagement rings. They have had much costly handwork done on them and added to their cost, as testified to by Mr. Cooper. There is no evidence that anyone ever melted one of them down. They were indisputably made to be used as such. The one package exhibited to the customs for export contained both wedding rings and engagement rings, but separately packed, and the manifest declared "Platinum Wedding Rings 191", "Platinum Engagement Rings, 107." This forfeiture statute forfeits only goods "about to be unlawfully exported", and not everything in the shipment, as some provisions of the tariff acts do. If the wedding rings were unlawful to export, but the engagement rings were not, there is no law to forfeit both. The district judge found "The engagement rings can well be considered as more usable by the trade in their present form, yet they are to be considered as a part of the whole and they also are subject to forfeiture." This statute does not so say. Not a one of the cases cited in the majority opinion touches the point. Nor do I find any relevancy of the cases cited to any question in this case.

I think the forfeiture unjustified, and that the judgment should be reversed, certainly as to the engagement rings.