UNITED STATES of America, Appellee,

v.

Paul AJLOUNY, Appellant.

No. 1075, Docket 80–1047.

United States Court of Appeals,
Second Circuit.

Argued April 21, 1980.

Decided Aug. 29, 1980.

John R. Wing, New York City, (Edward Burke, Julia Tobey, and Weil, Gotshal & Manges, New York City, on brief), for appellant.

Steven G. Nelson, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., on brief), for appellee.

Before WATERMAN, TIMBERS and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

Paul Ajlouny appeals from a conviction after a 17–day trial in the United States District Court for the Eastern District of New York (Mark A. Costantino, Judge) upon a jury verdict finding him guilty of transportation of stolen property in foreign commerce in violation of 18 U.S.C. § 2314 (1976). The jury was unable to reach a verdict and a mistrial was declared on the other 136 counts of the indictment, which charged Ajlouny with having used a "blue box"[1] to defraud the New York Telephone Company in violation of 18 U.S.C. § 1343 (1976). We affirm the conviction on the § 2314 count.

In March, 1978, the telephone company investigator in charge of the investigation of blue box use on Ajlouny's phone, advised customs agent Stephen Rogers that Ajlouny had made blue box calls to various locations in the Middle East. The telephone company investigator also permitted Rogers to

---

1. According to trial testimony, a blue box is a device that simulates tones used by the telephone company, thereby permitting long–distance calls to be made without generating any records and hence without incurring charges.

listen to a taped conversation with the investigator in which Ajlouny requested that the blue box investigation be halted and warned that it was "stirring up a hornet's nest," "blowing his cover," and endangering the lives of certain people in Israel and the United States. Through their own investigation, customs officials determined that some of the blue box calls placed from Ajlouny's residence had been made to the headquarters of the Palestine Liberation Organization in Beirut.

In early April, Rogers and other customs agents began surveillance of Ajlouny to determine whether he was the individual who had been placing blue box calls from phone booths in the vicinity of his residence. One morning, Rogers and another customs agent followed Ajlouny to a small shopping center where, according to Rogers, they observed him "apparently supervising the loading" of a cargo container. Through independent investigation, the customs agents learned that the container was under lease to Ajlouny and was scheduled to depart for Doha, Qatar, on April 17, 1978.

In mid–April when they discovered that the container was no longer in the shopping center, Rogers and other agents proceeded to a Brooklyn pier where they located the container in a customs control area. On the day the container was scheduled to be shipped, the customs agents obtained the dock receipt, which described the contents of the container as air conditioning equipment. The agents then proceeded to unseal and search the container,[2] which had not yet been loaded on board ship. Inside the container, the agents found considerable quantities of teletype and telecommunications equipment; no air conditioning equipment was found. The same day, telephone company investigators identified some of the equipment found in the container as stolen property.

Ajlouny was arrested the day after the search and ultimately indicted for trans-

porting stolen telecommunications equipment in foreign commerce in violation of 18 U.S.C. § 2314. After receiving his *Miranda* warnings, he admitted that he had arranged for shipment of the telecommunications equipment, but denied that the property was stolen. Prior to trial, he moved on Fourth Amendment grounds to suppress all evidence resulting from the search of the cargo container. Judge Costantino denied his suppression motion, *United States v. Ajlouny*, 476 F.Supp. 995, 1001–04 (E.D.N.Y.1979), and permitted the contents of the container to be introduced into evidence at trial.

### I.

On appeal, Ajlouny first contends that the search of the container was conducted without a search warrant and in the absence of "probable cause" or even "reasonable suspicion." On this basis, he urges that the search was unlawful under both Fourth Amendment and federal statutory standards, and that the admission of evidence obtained from the search requires reversal of his conviction.

■ The Government concedes that the search was warrantless and does not dispute the defendant's contention that it was not based on probable cause. But the Government contends, and Judge Costantino ruled, 476 F.Supp. at 1002–03, that the search was nevertheless lawful under the so–called "border search exception." We agree.

The border search exception, at least as it applies to searches of persons and property entering the country, has enjoyed a long judicial history. As the Supreme Court observed in *United States v. Ramsey*, 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977):

> Border searches . . . from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had *entered* into our country

---

**2.** At the suppression hearing, Agent Rogers testified that he also knew, prior to the search of the cargo container, that Ajlouny was affiliated with the PLO and a pro–Palestinian newspaper, had a license to carry a gun, and had previously attempted to import three guns into the State of New York.

from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders *without probable cause and without a warrant* are nonetheless "reasonable" has a history as old as the Fourth Amendment itself. [Emphasis added].

See *United States v. Thirty–seven Photographs*, 402 U.S. 363, 376, 91 S.Ct. 1400, 1408, 28 L.Ed.2d 822 (1971); *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925); *United States v. Asbury*, 586 F.2d 973, 975 (2d Cir. 1978).

■ Until recently, the applicability of the border search exceptions to export searches, such as the one conducted by customs officials in this case, was an open question. However, in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974), the Supreme Court noted that "those entering and *leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment . . ." (Emphasis added). Admittedly, this statement is dictum, since the issue before the Court did not concern the lawfulness of customs searches. Subsequently, this Circuit relied on the Supreme Court's statement to hold squarely that the border search exception applies to items leaving as well as entering the country. *United States v. Swarovski*, 592 F.2d 131, 133 (2d Cir. 1979);[3] *accord United States v. Stan-

ley*, 545 F.2d 661, 665–67 (9th Cir. 1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); see, *United States v. Asbury, supra*, 586 F.2d at 975. *Contra, People v. Esposito*, 37 N.Y.2d 156, 160, 371 N.Y.S.2d 681, 332 N.E.2d 863 (1975). Though the item searched in *Swarovski* was the luggage of a person about to leave the country, the ruling applies to items imminently to be exported, whether or not accompanying a traveler. Application of the border search exception depends upon the nexus between the goods and a border crossing, regardless of the circumstances under which the property subjected to search moved or will move across the border. See *United States v. Ramsey, supra*, 431 U.S. at 620, 97 S.Ct. at 1980; *United States v. Doe*, 472 F.2d 982, 984 (2d Cir.), *cert. denied*, 411 U.S. 969, 91 S.Ct. 2160, 36 L.Ed.2d 691 (1973).

■ The circumstances of this case establish that the border search exception applies and permits a routine search without probable cause or even reasonable suspicion. We have observed that "the precise limits of the border area depend on the particular factual situation presented by the case raising the issue." *United States v. Glaziou*, 402 F.2d 8, 12 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969). The container searched in this case was located on a pier, within a customs area, and marked for shipment abroad. It was therefore amenable to a routine border search. And the imminent crossing of the border alone makes the search of the con-

---

**3.** Appellant contends that *Swarovski* held only that departure searches are constitutional despite lack of a warrant, but did not resolve the question of whether such searches may be conducted in the absence of probable cause. We do not agree that the holding was as narrow as appellant urges. From a constitutional perspective, a search warrant will generally be required whenever probable cause is necessary for a search. The only exception is where exigent circumstances excuse the obtaining of a search warrant. *United States v. United States District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 33 L.Ed.2d 752 (1972); *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970). Yet *Swarovski* upheld a "warrantless" departure search with-

out any mention of exigent circumstances. This omission was not an oversight. What *Swarovski* implicitly holds is that probable cause is no more required for a departure search than is a warrant, because such a search is within the ambit of the border search exception. *See United States v. Ramsey, supra*, 431 U.S. at 621, 97 S.Ct. at 1981 (" 'border search' exception is not based on the doctrine of 'exigent circumstances' ").

This view of *Swarovski* is confirmed by the opinion's reliance on *United States v. Stanley*, 545 F.2d 661, 667 (9th Cir. 1976), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), which holds that probable cause is not constitutionally necessary for a departure search.

tainer reasonable, see *United States v. Ramsey, supra,* 431 U.S. at 619, 97 S.Ct. at 1980; *United States v. Nieves,* 609 F.2d 642, 645 (2d Cir. 1979), *cert. denied,* 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980), though reasonable suspicion would be required for more intrusive invasions of personal privacy. *United States v. Asbury, supra,* 586 F.2d at 975; see *United States v. Klein,* 592 F.2d 909, 911 (5th Cir. 1979). Though the facts known to the agents may well have established reasonable suspicion, as found by the District Judge, 476 F.Supp. at 1003, we hold that even if such reasonable suspicion was lacking, the search did not violate the Fourth Amendment.

■ Appellant further contends that even if constitutional standards were not exceeded, the search of the container and

the subsequent seizure of its contents violated the statutory limitations of 22 U.S.C. § 401(a) (1976).[4] This statute authorizes seizure of articles exported in violation of law. It conditions this seizure authority on the existence of probable cause to believe that the articles "are intended to be or are being or have been exported . . . in violation of law."[5] The statute applies in terms to arms and munitions, but includes "other articles" and has been consistently applied to any items destined for unlawful export.[6]

■ Though § 401(a) has been held implicitly to authorize searches as well as seizures of goods for export, *Samora v. United States,* 406 F.2d 1095, 1098 (5th Cir. 1969); *United States v. Marti,* 321 F.Supp. 59, 63–64 (E.D.N.Y.1970),[7] we find no basis for

4. Subsection 401(a) provides, in relevant part: *Whenever an attempt is made to export or ship from or take out of the United States any arms or munitions of war or other articles in violation of law, or whenever it is known or there shall be probable cause to believe* that any arms or munitions of war or other articles are intended to be or are being or have been exported or removed from the United States in violation of law, the Secretary of the Treasury, or any person duly authorized for the purpose by the President, may *seize and detain* such arms or munitions of war or other articles. . . . All arms or munitions of war and other articles . . . seized pursuant to this subsection shall be *forfeited.* [Emphasis added].

5. The structure of the statute permits a reading that renders the probable cause limitation inapplicable to some seizures. The first clause of the statute appears to permit seizure, without probable cause, "Whenever an attempt is made to export . . . articles in violation of law." The probable cause limitation applies, in terms, when the articles are "intended to be or are being or have been exported . . . in violation of law." It may be that Congress *intended to distinguish between border areas* and other locations, limiting the seizure power when the articles are away from a border area, as where they are destined for export, in transit, or have arrived at their foreign destination, but placing no statutory limitation (beyond whatever the Constitution imposes) on seizure at a border area where "an attempt" to export would be expected to occur. In view of our resolution of appellant's statutory argument, we need not rely on this possible interpretation.

6. Though "primarily directed to limiting the export of war materials in protection of Ameri-

can neutrality and foreign policy," § 401 has also "been consistently applied to other classes of goods." *United States v. Marti,* 321 F.Supp. 59, 63 (E.D.N.Y.1970); *see, e. g., United States v. Chabot,* 193 F.2d 287 (2d Cir. 1951) (gold); *Zarranz v. United States,* 182 F.2d 650 (5th Cir. 1950) (auto); *Joseph B. Cooper & Son, Inc. v. United States,* 174 F.2d 619 (5th Cir.), *cert. denied,* 338 U.S. 824, 70 S.Ct. 71, 94 L.Ed. 501 (1949) (platinum); *United States v. Marti, supra,* (jewelry); *United States v. 200 Watches,* 66 F.Supp. 228 (S.D.N.Y.1946) (watches).

7. We have previously held that customs officials have statutory authority to conduct inspections at a point of embarkation of cargo being shipped abroad. *United States v. Chabot, supra,* 193 F.2d at 290. In addition to § 401, *see* 50 U.S.C.App. § 2403(b)(1) (Supp. II 1978) (President may "prohibit or curtail the exportation, except under such rules and regulations as he shall prescribe, of any articles"); 15 C.F.R. § 386.8(b)(1) (1979) (commodities declared for export "are subject to examination by customs officials for the purpose of verifying the commodity" and assuring compliance with the Export Administration Regulations); 15 C.F.R. § 386.8(b)(5) (1979) (customs office is "authorized to inspect and search any exporting carrier at any time to determine whether commodities . . . are intended to be, or are being, exported or removed from the United States contrary to the Export Administration Regulations"); 22 C.F.R. § 127.05(a) (1979) (district directors of customs "authorized to take appropriate action to insure observance" of restrictions on export of arms and implements of war, "including but not limited to inspection of loading or unloading of carriers"). *See also* 19 U.S.C. § 1581(a) (1976) (customs

reading its probable cause requirement as a limitation on searches. The provision itself mentions seizures and forfeitures, not searches. And the legislative history gives no indication that authority to search was being limited. The predecessor of § 401, Espionage Act of 1917, ch. 30, tit. VI, 40 Stat. 223 (1917), provided an elaborate procedure for seizures and forfeitures of property sought to be exported in violation of law. Seizures were governed by the same probable cause standard, and almost the identical language, now found in § 401. In addition, § 2 of the statute required the obtaining of a warrant "to justify the further detention of the property" and § 3 permitted the owner or claimant to petition in the district court for return of the property. These provisions were primarily designed to protect innocent owners and claimants from the inconvenience and expense associated with unwarranted seizure and detention of their property. *United States v. 21 Pounds, 8 Ounces, of Platinum,* 147 F.2d 78, 81 (4th Cir. 1945); see *Rimmer v. United States,* 172 F.2d 954, 959 (5th Cir. 1949); *United States v. 267 Twenty–Dollar Gold Pieces,* 255 F. 217, 221 (W.D.Wash. 1919). There is no indication, however, that the law was also intended to protect persons against the less serious interference with property rights associated with a customs search.[8]

■ Once the search had discovered the telecommunications equipment in a container marked for shipment abroad with papers indicating that the contents was air conditioning equipment, the agents clearly had the probable cause § 401 requires to seize and detain the items. Since the search and subsequent seizure did not violate either § 401 or the Fourth Amendment, we affirm

officer may "at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters . . . or at any other authorized place . . . , and search . . . any person, trunk, package, or cargo on board").

8. In 1953, the Act was amended to its present form. Among the most significant of the changes was the streamlining of the procedures "for effecting forfeiture and disposition of property being or intended to be exported in

Judge Costantino's denial of the motion to suppress.

## II.

■ Appellant next contends that the Government failed to prove the occurrence of a border–crossing, an event he asserts is an essential element of an offense under 18 U.S.C. § 2314. The Government concedes that the cargo container was intercepted by customs officials before it had moved beyond the borders of the United States, but argues that its burden was nevertheless met by proof that the container had been transported to a restricted customs area and placed in the possession of a shipping company with instructions that it be shipped to a foreign destination. We find the Government's position persuasive.

The express terms of § 2314 do not indicate whether a border–crossing is a required element of the offense. The section provides, in pertinent part, that:

> Whoever *transports in* interstate or *foreign commerce* any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both [emphasis added].

The definitions of "interstate commerce" and "foreign commerce" are set out in 18 U.S.C. § 10 (1976):

> The term "interstate commerce" . . . includes commerce between one State, Territory, Possession, or the District of Columbia and another State, Territory, Possession, or the District of Columbia.
>
> The term "foreign commerce" . . . includes commerce with a foreign country.

violation of law," including the elimination of the warrant of detention requirement. H.R. Rep.No. 1073, 83rd Cong., 1st Sess. 1–2 (1953), *reprinted in* [1953] U.S.Code Cong. & Admin. News, pp. 2386, 2386-7. Though these and the other changes accomplished by the 1953 amendment were substantial, they in no way affected the original scope of the limitations of the Espionage Act, which continue to be applicable only to seizures and forfeitures.

The case law is similarly ambiguous on the need for an actual crossing of the border. Courts have frequently had occasion to observe that purely intrastate transportation of stolen property will not support a conviction under § 2314, *United States v. Walker*, 575 F.2d 209, 214–15 (9th Cir.), *cert. denied*, 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 325 (1978); *United States v. Poole*, 557 F.2d 531, 535–36 (5th Cir. 1977), but they have apparently not been called upon to decide whether the transportation element of the offense always requires an actual border crossing.[9] Unable to locate any direct case authority to support its position, the Government relies on the many cases in which convictions under 18 U.S.C. § 659[10] were upheld, even though no state or national border had been crossed. See, e. g., *United States v. Astolas*, 487 F.2d 275, 280–82 (2d Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); *United States v. Vilhotti*, 452 F.2d 1186, 1187 n. 1 (2d Cir. 1971), *cert. denied*, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972); *United States v. Berger*, 338 F.2d 485, 488 (2d Cir. 1964), *cert. denied*, 380 U.S. 923, 85 S.Ct. 925, 13 L.Ed.2d 809 (1965); *United States v. Sherman*, 171 F.2d 619, 622–23 (2d Cir. 1948), *cert. denied*, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949). Appellant contends, however, that differences in the wording and legislative histories of § 659 and § 2314 render inapplicable cases decided under § 659.

We need not decide whether the transportation element of § 2314 is satisfied by facts sufficient under § 659, since even under a more rigorous standard, the element of transportation "in foreign commerce" was established in the circumstances of this case. A shipment is sufficiently "in foreign commerce" for purposes of § 2314 once property bound for a foreign destination arrives in a customs area. There is no question that the Commerce Clause permits Congress to reach stolen goods at such a location, and we see no reason to doubt that Congress intended to do so. Even if § 2314 is concerned with the crossing of a national boundary, we believe Congress was not aiming only at stolen goods moving across a technical boundary line, but also wanted to reach shipments in the course of such a crossing, including at least goods at a dockside customs area.

### III.

Ajlouny next contends that his Fourth Amendment rights were violated because of wiretapping. The Government acknowledged in the District Court that the defendant's voice was overheard during warrantless electronic surveillance coinciding closely in time with the commission of the offense for which he was convicted. In January, 1979, in response to the defendant's request to check agency records to determine if he had been a target of electronic surveillance, the Government notified the defendant that his conversations had been

---

**9.** Some of the cases cited by the appellant contain language that supports his view concerning the necessity of a border crossing. *United States v. Squires*, 581 F.2d 408, 411 (4th Cir. 1978); *United States v. Scandifia*, 390 F.2d 244, 249 50 (2d Cir. 1968), *remanded on other grounds*, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969); *United States v. Walker*, 176 F.2d 564, 566 (2d Cir.), *cert. denied*, 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949). In each of these cases, however, a crossing of the border was determined to have occurred. The question whether the statute reaches items at a border *imminently to be transported across it* was not presented.

**10.** Section 659 provides, in pertinent part, as follows:

> Whoever embezzles, steals, or unlawfully takes . . . any goods or chattels *moving as or which are a part of or which constitute an interstate or foreign shipment* of freight, express, or other property; or
> . . . Whoever embezzles, steals, or unlawfully takes . . . from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier *moving in interstate or foreign commerce* or from any passenger thereon any money, baggage, goods, or chattels . . .
> Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both . . . . [Emphasis added].

The terms "interstate commerce" and "foreign commerce" are defined in the same manner for purposes of this section as for § 2314. 18 U.S.C. § 10.

overheard by the FBI "during the course of foreign intelligence national security electronic surveillances." Records of these conversations and descriptions of the premises which were the subject of the surveillances were submitted to the District Court *ex parte* for *in camera* inspection, with a request not to disclose them to the defendant. These submissions were accompanied by an affidavit of then Attorney General Griffin Bell, certifying that disclosure of the sealed materials "would prejudice the national interest" and representing that the surveillances had been:

> . . . authorized by the Attorney General pursuant to the power delegated to him by the President of the United States in the exercise of his authority relating to the Nation's foreign affairs as described in 18 U.S.C. § 2511(3), to protect the Nation against actual or potential attack or other hostile acts of foreign power, to obtain counter–intelligence (including foreign) information deemed essential to the security of the United States, and to protect national security information against foreign intelligence activities.

Additional records of FBI surveillance were submitted to the District Court in May, 1979.

After reviewing the records *in camera*, Judge Costantino denied Ajlouny's discovery and suppression motions, finding that the statements, though obtained without a warrant, were lawfully recorded during the course of foreign intelligence surveillance "of legitimate concern to the national security." *United States v. Ajlouny, supra*, 476 F.Supp. at 999 n.2. The District Court also found that the statements did "not concern the subject matter of the indictment, and were not used to initiate the investigation concerning the crimes charged." *Id.* Finally, the Court ruled that the *in camera* procedure employed in making these determinations was proper under the circumstances. *Id.* We agree that the defendant's discovery and suppression motions were properly denied.

In *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), the Supreme Court held that a defendant is entitled to disclosure, without prior *in camera* review, of all records of illegal surveillance, for the purpose of determining whether the Government's evidence at trial is tainted by the illegality. In so holding, the Court emphasized that the task of identifying "those records which might have contributed to the Government's case" is "too complex, and the margin for error too great, to rely wholly on the *in camera* judgment of the trial court."[11] *Id.* at 182, 89 S.Ct. at 971. Two weeks later, the Court observed in a brief *per curiam* opinion that the *Alderman* disclosure requirement is limited to illegal surveillance and therefore does not apply where the district court has made a finding that the surveillance was lawful. *Giordano v. United States*, 394 U.S. 310, 313, 89 S.Ct. 1163, 1165, 22 L.Ed.2d 297 (1969). As noted, Judge Costantino made just such a finding in this case.

The defendant challenges the District Court's finding on two grounds. He first contends that the Court erred as a matter of law in concluding that foreign intelligence electronic surveillance does not require a warrant. The defendant also raises the procedural objection that the subsidiary matters decided by Judge Costantino in upholding the legality of the surveillances, such as whether in fact they were conducted for national security and foreign intelli-

---

11. The Court acknowledged that the disclosure of surveillance records might "compel the Government to dismiss some prosecutions in deference to national security or third–party interests," but concluded that the requirement was nevertheless necessary to guard "against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny which the Fourth Amendment exclusionary rule demands." *Alderman v. United States, supra*, 394 U.S. at 184, 89 S.Ct. at 972.

Justices Harlan and Fortas dissented, in separate opinions, from the majority's holding that the same disclosure rule applies irrespective of whether disclosure implicates national security interests. *Id.* at 197–200, 209 11, 15, 89 S.Ct. at 979–980, 985–986.

gence purposes and whether they were reasonable in nature and scope, could not properly have been resolved without an adversary hearing and disclosure of relevant information. We first consider this procedural objection.

■ The Supreme Court has not yet decided what procedure the district courts are to follow in making threshold determinations concerning the lawfulness of electronic surveillance. *Giordano v. United States, supra,* 394 U.S. at 314, 89 S.Ct. at 1165 (Stewart, J., concurring). The Court has suggested, however, that adversary proceedings and full disclosure are not necessarily required "for resolution of every issue raised by an electronic surveillance." *Taglianetti v. United States,* 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302 (1969) (*per curiam*). To the contrary, such protections will not be required when the task is such that *in camera* procedures will adequately safeguard the defendant's Fourth Amendment rights, *id.* at 317–18.

■ We conclude that the *in camera* procedures employed by Judge Costantino in this case were adequate for purposes of determining the lawfulness of the FBI's surveillance of the defendant.[12] The issues of whether the surveillance was conducted for national security and foreign intelligence purposes and whether it was reasonable in scope, were limited in nature and were not dependent on a painstaking search through "a large volume of factual materials." *Alderman v. United States, supra,* 394

U.S. at 183–84, 89 S.Ct. at 972. Thus, the factors that impelled the Supreme Court to require disclosure in *Alderman* to assess whether evidence may be tainted are not present here. Having reviewed the *in camera* records, we agree with the District Court that this was a foreign intelligence surveillance, justifiably and reasonably conducted. We are also convinced that accurate resolution of the factual issues would not have been materially advanced by either disclosure of information to the defendant or an adversary hearing.

The substantive issue of whether foreign intelligence surveillance can be conducted lawfully without a judicial warrant was specifically left undecided by the Supreme Court in *United States v. United States District Court,* 407 U.S. 297, 308, 321–22, 92 S.Ct. 2125, 2138–39, 32 L.Ed.2d 752 (1972); see *Giordano v. United States, supra,* 394 U.S. at 314–15, 89 S.Ct. at 1165–66 (Stewart, J., concurring). The Third, Fifth, and Ninth Circuits subsequently determined that warrantless foreign intelligence gathering surveillance does not contravene the Fourth Amendment, *United States v. Buck,* 548 F.2d 871, 875 (9th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977); *United States v. Butenko,* 494 F.2d 593, 605 (3d Cir.) (*en banc*), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974); *United States v. Brown,* 484 .F.2d 418, 426 (5th Cir. 1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974), while the D.C. Circuit has expressed

---

12. We need not decide whether *ex parte, in camera* proceedings are adequate for the determination of all questions bearing upon the legality of electronic surveillance. Other courts have expressed differing views on the subject. *See, e. g., United States v. Butenko,* 494 F.2d 593, 598, 607 (3d Cir.) (*en banc*), *cert. denied,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974) (where the question concerns the legality of the taps, the district court has "discretion to grant or deny" requests for disclosure); *United States v. Hoffman,* 334 F.Supp. 504, 506 (D.D.C.1971) (preliminary determination of whether defendant's conversations were overheard in violation of Fourth Amendment can be made without an evidentiary hearing); *United States v. Brown,* 317 F.Supp. 531, 535 (E.D.La. 1970), *aff'd,* 484 F.2d 418 (5th Cir. 1973), *cert.*

denied, 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974) ("the determination of the legality of the surveillance can appropriately be made in *ex parte, in camera* proceedings").

The Foreign Intelligence Surveillance Act of 1978, Pub.L.No.95-511, which did not become effective until after completion of the surveillances in question here, provides for *ex parte, in camera* determination of the lawfulness of electronic surveillance, upon the filing by the Attorney General of a sworn affidavit that "disclosure or an adversary hearing would harm the national security of the United States." Disclosure of materials to the defendant is permitted "only where . . . necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f) (Supp. II 1978).

the view, in dicta, that such warrantless surveillance is unlawful. *Zweibon v. Mitchell*, 516 F.2d 594, 651 (D.C.Cir. 1975) (*en banc), cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). Our Circuit has not yet decided this important issue, and we find it unnecessary to do so in this case. If the surveillance were unlawful, the defendant would be entitled to disclosure of its results, pursuant to *Alderman*, and would then argue that the exclusionary rule requires suppression of any evidence obtained as a result of the surveillance. Since, for reasons to be discussed, we do not believe it would be appropriate to apply the exclusionary rule in this case, even if the surveillance were unlawful and did lead to any trial evidence, we need not adjudicate the lawfulness of the surveillance.

■ The Supreme Court has determined that the primary, if not the sole, justification for the exclusionary rule is the deterrence of police conduct that violates Fourth Amendment rights. *Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976); *United States v. Janis*, 428 U.S. 433, 446, 96 S.Ct. 3021, 3028, 49 L.Ed.2d 1046 (1976); *United States v. Calandra*, 414 U.S. 338, 347–48, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974). A second justification, the "imperative of judicial integrity," is also mentioned in some cases, see, *e. g., United States v. Peltier*, 422 U.S. 531, 536–38, 95 S.Ct. 2313, 2316–18, 45 L.Ed.2d 374 (1975); *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669 (1960), but its importance as a basis for suppressing probative evidence has now been discounted substantially, if not completely, see *Stone v. Powell, supra*, 428 U.S. at 485, 96 S.Ct. at 3048. Consistent with its views concerning the primary purpose of the exclusionary rule, the Court, in recent years, has refused to apply the rule to situations where it would achieve little or no deterrence. For example, in *United States v. Peltier, supra*, 422 U.S. at 541–42, 95 S.Ct. at 2319–20, the Court declined to give retroactive effect to an earlier search and seizure ruling on the ground that suppression would serve no deterrent purpose. See *Desist v. United States*, 394 U.S. 244, 254

n.24, 89 S.Ct. 1030, 1036, 22 L.Ed.2d 248 (1969) ("we simply decline to extend the court–made exclusionary rule to cases in which its deterrent purpose would not be served"). And, in *United States v. Calandra*, the Court refused to apply the exclusionary rule to grand jury proceedings because, in its view, the result would be "a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury." *United States v. Calandra, supra*, 414 U.S. at 351–52, 94 S.Ct. at 622. A process of balancing similar to that employed in *Calandra* appears in other exclusionary rule cases as well. *Stone v. Powell, supra*, 428 U.S. at 493–94, 96 S.Ct. at 3051–52 ("additional incremental deterrent effect" of permitting search and seizure claims to be raised on federal collateral review of state convictions is "outweighed by the acknowledged costs to other values vital to a rational system of criminal justice"); *United States v. Janis, supra*, 428 U.S. at 453–54, 96 S.Ct. at 3031–32 (additional marginal deterrence provided by forbidding use in federal civil proceeding of evidence illegally seized by state officials does not outweigh the cost to society of applying the rule in that situation); *Alderman v. United States, supra*, 394 U.S. at 174–75, 89 S.Ct. at 966–67 (additional benefits of extending exclusionary rule to persons aggrieved by introductions of evidence unlawfully obtained in violation of another person's privacy rights does not justify "further encroachment upon the public interest").

■ We believe this is a case in which neither deterrence nor the so–called "imperative of judicial integrity" would be served by application of the exclusionary rule. The Supreme Court has determined that where "law enforcement officials reasonably believed in good faith that their conduct was in accordance with the law," the imperative of judicial integrity is not offended by permitting unlawfully obtained evidence to be introduced at trial. *Stone v. Powell, supra*, 428 U.S. at 485 n. 23, 96 S.Ct. at 3048; *United States v. Peltier, supra*, 422

U.S. at 537–38, 95 S.Ct. at 2317–18; see *United States v. Reda*, 563 F.2d 510, 511–12 (2d Cir. 1977) (*per curiam*), *cert. denied*, 435 U.S. 973, 98 S.Ct. 1617, 56 L.Ed.2d 65 (1978). By all indications, the FBI's surveillances of Ajlouny met this test. At the time of the surveillances, neither the federal statutes nor the case law in this Circuit supported the defendant's contention that a warrant was required for foreign intelligence surveillance. Though Congress had established procedures governing the use of electronic surveillance for the investigation and the prevention of specified crimes, 18 U.S.C. §§ 2510–2520 (1976), it had specifically disclaimed any intention of legislating in the national security area, 18 U.S.C. § 2511(3) (1976) (repealed 1978).[13] Moreover, none of the district courts in this Circuit had decided what requirements, if any, the Fourth Amendment imposes upon foreign intelligence surveillance. And, if guidance had been sought from the decisions of other circuits, the preponderant view would have been that such surveillance can be conducted without a warrant. In short, this is not a case where the government agents who initiated the surveillance of the defendant could be charged with knowledge that their conduct was improper. *Cf. United States v. Dien*, 609 F.2d 1038, 1046 (2d Cir. 1979).

The apparent good faith of those who authorized the electronic surveillance of Ajlouny also tends to undercut any deterrence that might be achieved by application of the exclusionary rule. As the Supreme Court observed in *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), and restated in *United States v. Peltier, supra*, 422 U.S. at 539, 95 S.Ct. at 2318:

> The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force.

See *Scott v. United States*, 436 U.S. 128, 135–36, 98 S.Ct. 1717, 1722–23, 56 L.Ed.2d 168 (1978); *United States v. Corcione*, 592 F.2d 111, 118 (2d Cir.), *cert. denied*, 440 U.S. 975, 985, 99 S.Ct. 1548, 1801, 59 L.Ed.2d 794, 60 L.Ed.2d 248 (1979).

More significantly, the need to apply the exclusionary rule to achieve deterrence has been virtually eliminated by the significant clarification of standards that occurred with the enactment in October, 1978 of the Foreign Intelligence Surveillance Act of 1978, Pub.L.No.95–511, 92 Stat. 1783 (codified at 50 U.S.C. §§ 1801–1811 (Supp. II 1978)). The Act now requires with limited exceptions not relevant to this case,[14] the obtaining of a court order before foreign

---

**13.** Section 2511(3), which was repealed effective October 25, 1978 by the Foreign Intelligence Surveillance Act of 1978, Pub.L.No.95 511, Title II, § 201(c), 92 Stat. 1797 provided as follows:

> Nothing contained in this chapter or in section 605 of the Communications Act of 1934 . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect the Nation against actual or potential attack or other hostile acts of a foreign power, to obtain foreign intelligence information deemed essential to the security of the United States, or to protect national security information against foreign intelligence activities. Nor shall anything contained in this chapter be deemed to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government.

**14.** Subsections 1802(a)(1)(A)(i) and (a)(1)(A)(ii) of Title 50 permit foreign intelligence electronic surveillance without a court order only where the surveillance is solely directed at either the "acquisition of the contents of communications transmitted by means of communications used exclusively between or among foreign powers," or the "acquisition of technical intelligence, other than the spoken communications of individuals, from property or premises under the open and exclusive control of a foreign power." The FBI's surveillance of Ajlouny fell within neither of these categories.

intelligence surveillance may be conducted. Though the surveillance of Ajlouny, occurring prior to the Act's effective date, was not subject to this or any other statutory warrant requirement, passage of the Act substantially reduced the importance of deciding in this case whether the Constitution independently requires the obtaining of a warrant for foreign intelligence electronic surveillance. Though the exclusionary rule remains available in the event the new statutory requirements are not observed, there is little if any need to apply the rule to a possible Fourth Amendment violation now that agents' conduct in the future will normally be guided and measured by statutory standards. Application of the exclusionary rule in this case is therefore inappropriate. Consequently, we decline to adjudicate the constitutionality of warrantless foreign intelligence surveillance.

## IV.

Finally, appellant contends that Judge Costantino improperly denied his motions pursuant to Fed.R.Crim.P. 8(a) and 14 for severance of the § 2314 charge from the 136 blue box counts. He urges that the two sets of counts were "unrelated" to one another, and that joinder was both improper as a matter of law and prejudicial to his right to a fair trial.

The propriety of joinder under Rule 8(a) [15] is a question of law. Improper joinder requires reversal unless the Rule 8 error was harmless. *United States v. Werner*, 620 F.2d 922, 926 (2d Cir. 1980). In this case, the Government contends, and the District Court, in effect, found, that the stolen property count and the blue box counts represented "two or more acts or transactions connected together or constitu-

ting parts of a common scheme or plan." In its opinion denying defendant's pretrial severance motion, the District Court concluded that it was "not speculative" for the Government to attempt to show that the purpose of "the blue box calls was to facilitate the theft and shipments of the communications equipment." 476 F.Supp. at 1000. This conclusion was principally grounded on the Government's representation that the theft was part of a scheme to aid the PLO in establishing an independent telecommunications system and the Court's finding that the clandestine calls, some of which were alleged to have been placed to locations in the Middle East having a connection to the stolen property count, were an "appropriate vehicle for facilitating the plan." *Ibid.*

Having examined the Government's pretrial representations and proof at trial, we find substantial justification for the joinder of the stolen property count with at least one of the blue box counts. Evidence was introduced at trial that the blue box call charged in count 118 of the indictment was placed to the telephone number of the company in Qatar to which the cargo container was addressed. An available inference, sufficient to justify joinder on a theory of "common scheme or plan," is that the purpose of this call was to discuss arrangements for the shipment of the stolen communications equipment.

By contrast, the relationship of most of the other blue box calls to the common scheme or plan, particularly those placed to locations within the United States, is unclear.[16] With respect to the vast majority of the 136 calls, the Government made no effort to establish any connection to either the stolen property count or the alleged plan to set up an independent PLO telecom-

---

15. Rule 8(a) provides:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

16. The Government did attempt to introduce evidence at trial that one of the numbers called with a blue box from the Ajlouny residence was used by the PLO headquarters in Beirut, Lebanon. The number appears in six of the counts charged in the indictment. Judge Costantino declined to admit the proferred evidence.

munications network. We nevertheless conclude that even if the joinder of the stolen property count with the apparently unrelated blue box counts was improper under Rule 8(a),[17] the error was harmless.

■ Our previous decisions have established that an improper joinder under Rule 8 will generally constitute harmless error if "all or substantially all the evidence admitted at the joint trial would have been admissible in separate trials." *United States v. Werner, supra,* 620 F.2d at 926 n. 5; *United States v. Turbide,* 558 F.2d 1053, 1061 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *United States v. Granello,* 365 F.2d 990, 995 (2d Cir. 1966), *cert. denied,* 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967). If Ajlouny had been tried only on the stolen property count and count 118, which were related, much of the evidence concerning the other blue box counts would have been admissible to show that the defendant had access to a blue box and that the device was functional when attached to his home telephone. Perhaps the full extent of defendant's alleged use of the blue box would have been cumulative at such a separate trial, but not prejudicial once the jury properly received evidence that defendant had repeatedly defrauded the telephone company. We conclude therefore that if misjoinder occurred, it was harmless error. The same considerations make clear that Judge Costantino did not abuse his discretion in denying severance under Rule 14.

We have considered appellant's other claims of error and find no basis to disturb the conviction.

Affirmed.

---

17. The 136 blue box counts represent offenses of a "similar character" and therefore were properly joined with each other under Rule 8(a). This does not necessarily mean, however, that all the 136 blue box counts were properly joined with the stolen property count. Though at least one of the blue box counts and the stolen property count were joinable as parts of a common scheme or plan, most of the other blue box counts had no apparent connection or similarity to the stolen property count. Our finding of harmless error makes it unnecessary to consider whether joinder was proper on a theory that counts joinable to common counts are joinable to each other.