UNITED STATES of America,

v.

Gabriel MEGAHEY et al., Defendants.

No. CR–82–00327.

United States District Court,
E.D. New York.

Dec. 1, 1982.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Carol B. Amon, Asst. U.S. Atty., Brooklyn, N.Y., for United States of America.

Bernard Kenny, New York City, for defendant Gabriel Megahey.

Edward S. Panzer, New York City, and William A. Kelly, New City, N.Y., for defendant Andrew Duggan.

David L. Lewis, New York City, for defendant Colm Meehan.

Michael G. Dowd, Kew Gardens, N.Y., for defendant Eamon Meehan.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

By a superseding indictment filed on August 18, 1982, defendants Gabriel Megahey, Andrew Duggan, Colm Meehan, Eamon Meehan, and seven defendants who have not been apprehended are accused of conspiring to smuggle arms, explosives, and equipment to the Provisional Irish Republican Army; exporting firearms and ammunition without an export license; transporting and shipping blasting caps and other firearms in interstate and foreign commerce; and other related firearms offenses. Defendants Colm Meehan and Eamon Meehan are additionally accused of being illegal aliens and receiving, possessing, and transporting firearms in interstate commerce. Defendants Gabriel Megahey, Colm Meehan, and Eamon Meehan are all said to be aliens, whereas defendant Duggan is said to be a United States citizen. All defendants who have appeared have entered pleas of not guilty to all charges against them.

This matter is currently before the Court on (1) defendants' motions to suppress the fruits of electronic surveillance said to have been conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA" or the "Act"), 50 U.S.C. §§ 1801 *et seq.*, which the Government intends to introduce at trial, and (2) on the Government's application to have this Court determine the legality of the electronic surveillance in an *ex parte, in camera* proceeding pursuant to 50 U.S.C. § 1806(f).

For the reasons set forth below, the defendants' *motions are denied*, and the surveillance is determined to be valid. What follows sets forth the essential findings on which these determinations are based, as required by Rule 12(e) of the Federal Rules of Criminal Procedure. The findings derive from the undisputed assertions of the papers filed as part of the public record in this matter as well as the *ex parte, in camera* submission made by the Government pursuant to 50 U.S.C. § 1806(f).

## THE FISA SURVEILLANCE

On February 5, 1982, pursuant to a request made by the Government in the course of a foreign counter-terrorist investigation being conducted by the FBI, a judge of the United States Foreign Intelligence Surveillance Court ("FISC") issued an order authorizing electronic surveillance on the home telephone of defendant Megahey.

Electronic surveillance pursuant to that order began on February 10, 1982. An order authorizing the continuation of the surveillance was entered by FISC on May 6, 1982. The surveillance continued thereafter until defendant Megahey was arrested on June 21, 1982.

On July 27, 1982, pursuant to FISA, 50 U.S.C. § 1806(b), the Acting Attorney General authorized the use of all tape recordings obtained from the surveillance and any information derived therefrom relating to the criminal activity of the defendants at their trial on the superceding indictment described above. Pursuant to letters dated July 28 and August 2, 1982, defendants and this Court were notified, as required by 50 U.S.C. § 1806(c), that the Government intends to introduce information from the FISA surveillance in evidence at the trial.

Defendant Megahey is the only defendant at whom the electronic surveillance was directed. Other defendants, however, were overheard incidentally during the Megahey surveillance. In August and September 1982, counsel for all defendants were provided by the Government with copies of the tape recordings, transcripts, surveillance logs, and pen register tapes of all telephone conversations from calls intercepted during the surveillance that are deemed by the Government to be relevant to the prosecution. Thereafter, under a protective order signed by counsel for all four defendants and entered on October 6, 1982, the Government was ordered to turn over to counsel for the defendants the balance of the tape recordings made pursuant to the electronic surveillance and related documents requested by defendants, such as pen register tapes and surveillance logs, under restrictive conditions designed to protect the identities of and information concerning any United States person as defined in 50 U.S.C. § 1801(i).

## THE FOREIGN INTELLIGENCE SURVEILLANCE ACT

The surveillance at issue was conducted pursuant to FISA, which was enacted into law on October 25, 1978. Pub.L. 95–511, 92 Stat. 1783 (1978).

The Act is designed to establish a procedure under which the Attorney General can obtain a judicial order authorizing electronic surveillance in the United States to acquire information for foreign intelligence purposes. S.Rep. No. 95–604, 95th Cong., 2d Sess., *reprinted in* 4 U.S.Code Cong. & Admin.News 3904, 3906 (1978) (hereinafter "Legislative History"). The Act authorizes the Chief Justice of the United States to designate seven district court judges, who, sitting as members of the Foreign Intelligence Surveillance Court of the United States, may hear applications for and grant orders approving electronic surveillance for foreign intelligence purposes. 50 U.S.C. § 1803(a). The Act makes provision for appellate review, by a specially created court of review and, ultimately, by the Supreme Court, of orders denying applications for surveillance. 50 U.S.C. § 1803(b).

Under the Act, a judge may issue an order authorizing electronic surveillance within the United States only if he finds that (1) the President has authorized the Attorney General to approve applications for electronic surveillance pursuant to FISA,[1] (2) the application has been made by a federal officer and approved by the Attorney General, (3) on the basis of the facts submitted by the applicant, there is probable cause to believe that (a) the target of the electronic surveillance is a "foreign power"[2] or an "agent of a foreign power,"[3] provided that no "United States person"[4] may be considered a "foreign power" solely on the basis of activities protected by the first amendment to the U.S. Constitution

---

1. By Executive Order No. 12,139, 44 Fed.Reg. 30,311, May 23, 1979, President Carter authorized the Attorney General to approve applications to obtain orders for electronic surveillance to acquire foreign intelligence information.

2. See 50 U.S.C. § 1801(a).

3. See 50 U.S.C. § 1801(b).

4. A "United States person" is defined as "a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 1101(a)(20) of Title 8), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent resi-

and (b) each of the facilities or places at which the electronic surveillance is directed is being used or is about to be used by a "foreign power" or an "agent of a foreign power," (4) the proposed minimization procedures meet the requirements of the Act,[5] and (5) the filed application contains all statements and certifications required by the Act and that, if the target of the surveillance is a "United States person," the certification or certifications are not "clearly erroneous."[6] The order may approve electronic surveillance for no longer than 90 days, but extensions of up to 90 days may be granted on application, provided the same findings are made as are required for the original order. In certain instances involving certain "foreign powers," electronic surveillance may be approved for up to one year. In the event an emergency arises and resort to a court is impossible, the Attorney General is authorized to approve brief electronic surveillance without a court order. 50 U.S.C. §§ 1802(a), 1805(e).

Under the Act, information acquired from a FISA surveillance concerning any "United States person" may be used and disclosed without the consent of the "United States person" only in accordance with the minimization procedures noted above. No information acquired from a FISA electronic surveillance may be used or disclosed except for lawful purposes. 50 U.S.C. § 1806(a). Furthermore, no information acquired pursuant to FISA may be disclosed for law enforcement purposes "unless such disclosure is accompanied by a statement that such information, or any information derived therefrom, may only be used in a criminal proceeding with the advance authorization of the Attorney General." 50 U.S.C. § 1806(b).

FISA is the first statute enacted to regulate the use of electronic surveillance within the United States for foreign intelligence purposes. Legislative History at 3908. As the Senate report on FISA states regarding the purpose of its enactment:

"The need for ... statutory safeguards has become apparent in recent years. The legislation is in large measure a response to the revelations that warrantless electronic surveillance in the name of national security has been seriously abused. These abuses were initially illuminated in 1973 during the investigation of the Watergate break-in. Since that time, however, the Senate Select Committee to Study Government Operations with Respect to Intelligence Activities, chaired by Senator Church, ... has concluded that every President since Franklin D. Roosevelt asserted the authority to authorize warrantless electronic surveillance and exercised that authority."

*Id.* The Senate report notes the infringement of and chilling effect on the constitutional rights of surveillance targets and those with whom the targets communicated caused by the previously unregulated nature of national security surveillance. Thus, FISA was "designed ... to curb the practice by which the Executive Branch may conduct warrantless electronic surveillance on its own unilateral determination that national security justifies it," while providing for the orderly continuation of "the legitimate use of electronic surveillance to obtain foreign intelligence information." Legislative History at 3910. As the Senate report notes:

"Striking a sound balance between the need for such surveillance and the protection of civil liberties lies at the heart of [the Act] .... [It] is designed to permit the Government to gather necessary foreign intelligence information by means of electronic surveillance but under limitations and according to procedural guidelines which will better safeguard the rights of individuals."

*Id.*

## THE INSTANT MOTIONS

Defendants have moved to suppress the fruits of the FISA surveillance on a wide

---

dence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in subsection (a)(1), (2), or (3) of this section." 50 U.S.C. § 1801(i).

**5.** See 50 U.S.C. § 1801(h).

**6.** See 50 U.S.C. § 1804(a) and (b).

variety of grounds. First, they seek suppression on the ground that the FISA surveillance was in violation of their fourth amendment rights against unreasonable searches and seizures. Second, defendants argue that employment of FISA in this case was for the purpose of gathering evidence of a crime and that use of the fruits of the FISA surveillance would violate their fifth amendment due process rights. Third, they argue that the fruits of the FISA surveillance should be suppressed unless the Court disregards § 1806(f) of the Act and permits a full adversarial evidentiary hearing on the propriety of the surveillance. Fourth, defendants argue that the fruits of the FISA surveillance should be suppressed on the ground that there was an insufficient basis for that surveillance under the Act and that the Government impermissibly relied on first amendment activities of the defendants in obtaining authorization for that surveillance. Fifth, they submit that the fruits of the FISA surveillance must be suppressed due to the Government's failure to comply with the minimization requirements of the FISA orders. Sixth, defendants argue that FISA is invalid under the separation of powers and political question doctrines of the U.S. Constitution. Seventh, they assert that the establishment of FISC under FISA is unconstitutional under Article III of the U.S. Constitution. Eighth, defendants argue that FISA unconstitutionally denies due process to aliens.

The FISA establishes unique procedures for judicial consideration of motions to suppress the fruits of FISA surveillance in proceedings in which the Government seeks to introduce evidence obtained or derived from an FISA surveillance against a criminal defendant. 50 U.S.C. § 1806. These procedures are the exclusive procedures to be followed when a motion to suppress is made. 50 U.S.C. § 1806(f). *See* Legislative History at 3958–59. Section 1806(f) provides in pertinent part that, when motions to suppress, such as those filed by defendants here, are made, the court shall,

> "notwithstanding any other law, if the Attorney General files an affidavit under oath that disclosure or an adversary hearing would harm the national security of the United States, review *in camera* and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance of the aggrieved person was lawfully authorized and conducted."

50 U.S.C. § 1806(f).[7] Subsection (f) concludes by noting:

> "In making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance."

*Id.* The Acting Attorney General of the United States has filed an affidavit under oath with this Court asserting that it would harm the national security of the United States to disclose or conduct an adversary hearing with respect to documents of the United States Foreign Intelligence Surveillance Court that have been submitted. Pursuant to that affidavit, as noted above, the United States Attorney has petitioned this Court to determine the legality of the FISA surveillance in an *ex parte, in camera* proceeding as contemplated by 50 U.S.C. § 1806(f).

### 1. *Fourth Amendment Issues*

Defendants seek to suppress the fruits of the FISA surveillance on the ground that the surveillance was in violation of their fourth amendment rights against unreasonable searches and seizures. In essence, de-

---

7. An "aggrieved person" is defined as a "person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." 50 U.S.C. § 1801(k). Defendant Megahey is aggrieved since he was the target of the FISA surveillance. Defendants Duggan, Colm Meehan, and Eamon Meehan are aggrieved because their communications and activities were apparently all subjected to electronic surveillance.

**1186**

fendants argue that the FISA surveillance violated defendants' fourth amendment rights since it was conducted without a warrant issued upon a finding of probable cause and that there is no justifiable "national security" exception to the warrant requirement; and second, that, even if there is such an exception, that exception does not apply here.

There is no universal requirement of a warrant before a search can be conducted under the fourth amendment. Courts have permitted warrantless searches and seizures in a variety of contexts. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, *reh. denied,* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971) (plain view); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) (search incident to arrest); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967) (stop and frisk); *United States v. Mississippi Power & Light Co.,* 638 F.2d 899 (5th Cir.1981), *cert. denied,* 454 U.S. 892, 102 S.Ct. 387, 70 L.Ed.2d 206 (1982) (administrative search); *United States v. Esquer-Rivera,* 542 F.2d 521 (9th Cir.1976) (fixed checkpoint search); *United States v. Clark,* 498 F.2d 535 (2d Cir.1974) (airport search); *United States v. Bell,* 457 F.2d 1231 (5th Cir.1972) (courtroom search).

A "national security" exception to the warrant requirement under the fourth amendment has also achieved recognition from the courts. While the Supreme Court has never decided this issue directly, it formulated an analytical approach to the issue in *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter the *"Keith"* case). *Keith* involved a warrantless wiretap surveillance approved by the Attorney General for the purpose of "gather[ing] intelligence information deemed necessary to protect the nation from attempts of domestic organizations to attack and subvert the existing structure of the Government." 407 U.S. at 300, 92 S.Ct. at 2128. The Government argued that the surveillances, though warrantless, were lawful as a reasonable exercise of presidential power to protect the national security. The Court held that the

fourth amendment requires prior judicial approval for the type of domestic security surveillance involved, reasoning that fourth amendment freedoms cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch, 407 U.S. at 316–17, 92 S.Ct. at 2136–37, and that resort to appropriate warrant procedures would not frustrate the purposes of domestic security searches. *Id.* at 321, 92 S.Ct. at 2138. The Court emphasized, however, that it was addressing only the domestic aspect of national security and that it was expressing no opinion concerning "the issues which may be involved with respect to activities of foreign powers or their agents." *Id.* at 321–22, 92 S.Ct. at 2138–39. As noted by Judge McLaughlin in *United States v. Falvey,* 540 F.Supp. 1306 (E.D.N.Y.1982), while the court did not address the constitutionality of warrantless electronic surveillance in cases involving a foreign power or its agents,

"[i]t recognized, however, that there were distinctions between Title III criminal surveillances [18 U.S.C. §§ 2510 *et seq.*] and those involving the national security, and urged Congress to delineate an appropriate standard for issuing warrants where national security was at stake."

540 F.Supp. at 1309, citing *Keith,* 407 U.S. at 322–33, 92 S.Ct. at 2139–45. Indeed, the Supreme Court stated:

"Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens. For the warrant application may vary according to the governmental interest to be enforced and the nature of citizen rights deserving protection."

407 U.S. at 322–23, 92 S.Ct. at 2139–40. Congress was aware of and considered this aspect of the *Keith* decision when it enacted FISA. Legislative History at 3914–17, 3980–85.

Several courts of appeals have ruled that the fourth amendment does not require a

warrant for electronic surveillance involving foreign intelligence and foreign powers. In *United States v. Brown,* 484 F.2d 418 (5th Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1490, 39 L.Ed.2d 575 (1974), the court upheld the legality of a surveillance in which the defendant was incidentally overheard via a warrantless wiretap authorized for foreign intelligence purposes. The court held that the President may constitutionally authorize warrantless wiretaps to gather foreign intelligence on the basis of his duty to act for the United States in foreign affairs and his inherent power to protect the national security. 484 F.2d at 426. In *United States v. Butenko,* 494 F.2d 593 (3d Cir.) (*en banc*), *cert. denied sub nom. Ivanov v. United States,* 419 U.S. 881, 95 S.Ct. 147, 42 L.Ed.2d 121 (1974), the court similarly held that warrantless electronic surveillance is permissible so long as its primary purpose was to obtain foreign intelligence information. Yet, as Congress noted in considering the legislation that was eventually to be enacted as FISA:

> "Neither *Brown* nor *Butenko* provide[s] a systematic analysis of the problem within the framework indicated by the Supreme Court decision in *Keith,* i.e., whether the requirement of a warrant would unduly frustrate the exercise of the President's responsibility in the area of national security. The court's opinion in *Brown* simply confirmed the President's inherent power to authorize foreign intelligence collection through, among other things,

electronic surveillance without a warrant. The *Butenko* opinion offers a slightly more extensive analysis of the problem."

Legislative History at 3917 n. 26.[8]

In *United States v. Truong Dinh Hung,* 629 F.2d 908 (4th Cir.1980), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982), the court held that the executive need not always obtain a warrant for foreign intelligence surveillance and in so doing, directly tracked the analytical approach formulated by the Supreme Court in *Keith.* Following the two prong test posited in *Keith,*[9] the Court of Appeals recognized a foreign intelligence exception to the warrant requirement, stating:

> "For several reasons, the needs of the executive are so compelling in the area of foreign intelligence, unlike the area of domestic security, that a uniform warrant requirement would, following *Keith,* 'unduly frustrate' the President in carrying out his foreign affairs responsibilities. First of all, attempts to counter foreign threats to the national security require utmost stealth, speed, and secrecy. A warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign intelligence threats, and increase the chance of leaks regarding sensitive executive operations.... More importantly, the executive possesses

---

**8.** *See also United States v. Buck,* 548 F.2d 871 (9th Cir.), *cert. denied,* 434 U.S. 890, 98 S.Ct. 263, 54 L.Ed.2d 175 (1977), where the court simply stated that "[f]oreign security wiretaps are a recognized exception to the general warrant requirement," *id.* at 875–76, and cited *Butenko* and *United States v. Clay,* 430 F.2d 165, 170 (5th Cir.1970), *rev'd on other grounds,* 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971). The only Court of Appeals' decision suggesting that a warrant must be obtained for all electronic surveillance conducted within the United States is *Zweibon v. Mitchell,* 516 F.2d 594, 633–51 (D.C.Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 187 (1976), where the Court of Appeals for the District of Columbia, in an opinion holding that a warrant is required before a wiretap can be placed on a domestic organization that is neither an agent of, nor acting in collaboration with, a foreign

power, stated, in *dicta* and as a plurality that "an analysis of the policies implicated by foreign security surveillance indicates that, absent exigent circumstances, all warrantless electronic surveillance is unreasonable and therefore unconstitutional." 516 F.2d at 613–14. *See also United States v. Ajlouny,* 629 F.2d 830, 839–40 (2d Cir.1980).

**9.** As stated in *Keith,* "... the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before ... surveillance is undertaken. We must also ask whether a warrant would unduly frustrate the efforts of Government to protect itself from acts of subversion and overthrow directed against it." 407 U.S. at 315, 92 S.Ct. at 2135, *quoted in Truong,* 629 F.2d at 913.

unparalleled expertise to make the decision whether to conduct foreign intelligence surveillance, whereas the judiciary is largely inexperienced in making the delicate and complex decisions that lie behind foreign intelligence surveillance.... Perhaps most crucially, the executive branch not only has superior expertise in the area of foreign intelligence, it is also constitutionally designated as the pre-eminent authority in foreign affairs.... In sum, because of the need of the executive branch for flexibility, its practical experience, and its constitutional competence, the courts should not require the executive to secure a warrant each time it conducts foreign intelligence surveillance."

629 F.2d at 913–14 (citations omitted).[10]

While recognizing a foreign intelligence exception to the warrant requirement, the *Truong* court limited the scope of that exception in two important respects that are particularly germane here. First, the court stated that,

"because individual privacy interests are severely compromised any time the government conducts surveillance without prior judicial approval ... the government should be relieved of seeking a warrant only when the object of the search or the surveillance is a foreign power, its agent or collaborators."

629 F.2d at 915. Second, the court stated that

"the executive should be excused from securing a warrant only when the surveillance is conducted 'primarily' for foreign intelligence reasons.... [Surveillance targets must] receive the protection of the warrant requirement if the government is primarily attempting to put together a criminal prosecution."

629 F.2d at 915–16.[11]

In light of this precedent, it is evident that there is a strong case for the recognition of a foreign intelligence exception to the warrant requirement under the fourth amendment. Whether this case is one to which that exception applies turns on whether surveillances authorized pursuant to FISA generally fall within this exception and, if so, whether the particular surveillance undertaken in this case was legitimate under FISA itself.

██ On the face of the statute, surveillance authorized pursuant to FISA is within the recognized foreign intelligence exception to the warrant requirement. Each application for a FISC order approving electronic surveillance under FISA must include a certification by the Assistant to the President for National Security Affairs or

---

**10.** FISA was not yet in effect at the time the surveillance at issue in *Truong* was authorized. However, the *Truong* court noted with respect to FISA:

"While the Act itself suggests that it is possible for the executive branch to conduct at least some types of foreign intelligence surveillance while being subject to a warrant requirement, the complexity of the statute also suggests that the imposition of a warrant requirement, beyond the constitutional minimum described in this opinion, should be left to the intricate balancing performed in the course of the legislative process by Congress and the President. The elaborate structure of the statute demonstrates that the political branches need great flexibility to reach the compromises and formulate the standards which will govern foreign intelligence surveillance. Thus, the Act teaches that it would be unwise for the judiciary, inexpert in foreign intelligence, to attempt to enunciate an equally elaborate structure for core foreign intelligence surveillance under the guise

of a constitutional decision. Such an attempt would be particularly ill-advised because it would not be easily subject to adjustment as the political branches gain experience in working with a warrant requirement in the foreign intelligence area." 629 F.2d at 914–15 n. 4.

**11.** In *Truong,* the surveillance at issue was initiated to seek out and stop the source of documents being "leaked" from the United States Information Agency. It was later revealed that the surveillance was continued well after the source of the "leak" was located and after a primarily criminal investigation had begun. The court barred the use of evidence obtained from the surveillance after the date on which the focus of the government's investigation changed, finding that the government could "proceed without a warrant only so long as the investigation was 'primarily' a foreign intelligence investigation." 629 F.2d at 913. *See also Butenko, supra,* 494 F.2d at 604–05.

an executive branch official or officials designated by the President [12] "that the certifying official deems the information sought to be foreign intelligence information," 50 U.S.C. § 1804(a)(7)(A), and a statement of the basis for that certification, 50 U.S.C. § 1804(a)(7)(E)(i). "Foreign intelligence information" is defined as:

"(1) information that relates to, and if concerning a United States person is necessary to, the ability of the United States to protect against—

(A) actual or potential attack or other grave hostile acts of a foreign power or an agent of a foreign power;

(B) sabotage or international terrorism by a foreign power or an agent of a foreign power; or

(C) clandestine intelligence activities by an intelligence service or network of a foreign power or by an agent of a foreign power; or

(2) information with respect to a foreign power or foreign territory that relates to, and if concerning a United States person is necessary to—

(A) the national defense or the security of the United States; or

(B) the conduct of the foreign affairs of the United States."

50 U.S.C. § 1801(e). Furthermore, in approving an application for surveillance and issuing an order, the FISC judge must find that, on the basis of the facts submitted by the applicant, there is probable cause to believe that the target of the electronic surveillance is a foreign power or an agent of a foreign power; that each of the facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a foreign power or an agent of a foreign power; that the application filed contains all the statements and certifications required by § 1804, including the certification that the certifying officer believes the information sought to be foreign intelligence information as defined, together with a statement of the basis for that belief; and that, if the target is a "United States person," the certifications

are not clearly erroneous. 50 U.S.C. § 1805.

Given these standards, surveillance under FISA comes within the requirements of the *Truong* decision for warrantless foreign intelligence surveillance. While *Truong* requires that the executive should be excused from securing a warrant only when the surveillance is conducted "primarily" for foreign intelligence reasons, 629 F.2d at 915, this requirement is clearly implicit in the FISA standards set forth above.

■ The next stage is to determine whether the surveillance undertaken in this case was legitimate under FISA. The principal issue raised by defendants in this connection is whether the FISA surveillance in this case was employed solely for the purpose of obtaining evidence for use in a criminal prosecution. If this assertion were correct, not only would FISA appear to have been improperly used, but it would also indicate that the *Truong* requirement that the executive may be excused from securing a warrant only when the surveillance is conducted "primarily" for foreign intelligence reasons has not been met. 629 F.2d at 915.

There can be no doubt that Congress contemplated the use of the fruits of FISA surveillance in criminal proceedings. This fact is evident from § 1806(c)–(h), which regulates the use of the fruits of such surveillance in criminal proceedings. Congress clearly viewed arrest and criminal prosecution as one of the possible outcomes of a foreign intelligence investigation. As the Senate noted in its consideration of FISA,

"[i]ntelligence and criminal law enforcement tend to merge in [the area of foreign counterintelligence investigations] . . . . [S]urveillances conducted under [FISA] need not stop once conclusive evidence of a crime is obtained, but instead may be extended longer where protective measures other than arrest and prosecution are more appropriate."

Legislative History at 3979–80.

However, at the same time, surveillance under FISA is appropriate only if foreign

---

**12.** *See* Executive Order No. 12,139, 44 Fed.Reg. 30,311 (1979).

intelligence surveillance is the Government's primary purpose. As noted above, FISA surveillance is permitted only when an executive official certifies that the information sought is foreign intelligence information. 50 U.S.C. §§ 1804(a)(7)(A), 1805.

My *ex parte, in camera* review of the Government's submissions before FISC in this matter and the FISC judges' decisions authorizing the surveillance in question confirm that the purpose of the surveillance in this case, both initially and throughout, was to secure foreign intelligence information and was not, as defendants assert, directed towards criminal investigation or the institution of a criminal prosecution. The appropriate certification and statements were made as required by § 1804(a)(7)(A) and (E)(i). As the Government's publicly filed affidavit makes clear, the FBI was conducting an international terrorist investigation at the time the electronic surveillance was instituted, and the surveillance was sought to further that investigation without any decision being made to use the information in criminal proceedings. As the legislative history indicates, it is understandable that arrest and criminal prosecution is not a necessary result of an international terrorist investigation:

> "One might wonder why the Government would not immediately arrest [known international terrorists]. In some cases they may not have violated U.S. law, even though they may have murdered hundreds of persons abroad. In other cases it may be more fruitful in terms of combatting international terrorism to monitor the activities of such persons in the United States to identify otherwise unknown terrorists here, their international support structure, and the location of their weapons or explosives."

H.Rep. 95–1283, Pt. I, "Foreign Intelligence Surveillance Act of 1978," 95th Cong., 2d Sess. 43–44 (1978). Accordingly, I find that the surveillance conducted in this case was done in compliance with FISA and was, therefore, assuming that there is a valid exception to the fourth amendment warrant requirements for foreign intelligence surveillance, within that exception.

■ It seems to me, however, equally if not more satisfactory from a constitutional viewpoint to conclude that the FISA warrant is a warrant within the meaning of the fourth amendment, since it provides for the interposition of independent judicial magistrates between the executive and the subject of the surveillance which the warrant requirement was designed to assure. In this connection, however, defendants argue that the authorization of electronic surveillance pursuant to FISA is unconstitutional because the Act permits surveillance under a standard that is less than "probable cause."

The text of the fourth amendment provides that "no Warrants shall issue but upon probable cause." U.S. Const.Amend. IV. While as noted above there is weighty case precedent, stated most strongly in *Truong*, indicating that there is a foreign intelligence exception to the fourth amendment warrant requirement, even if one characterizes the procedure by which foreign intelligence surveillance is authorized under FISA as the issuance of a "warrant," it is apparent that the standards and procedures set by FISA guarantee that the "probable cause" requirement will be observed.

As the Supreme Court has noted: "In cases in which the Fourth Amendment requires that a warrant to search be obtained, 'probable cause' is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness." *Camara v. Municipal Court,* 387 U.S. 523, 534, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967). "Probable cause" is not, however, a fixed or static concept. Rather, as the Supreme Court has emphasized, "probable cause" is a concept whose exact definition depends on the circumstances of each case, and "[t]o apply this standard, it is obviously necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen." *Camara,* 387 U.S. at

534–35, 87 S.Ct. at 1733–34.[13] As the Court has stated in defining "probable cause":

> "The warrant procedure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. But reasonableness is still the ultimate standard. If a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant.... Such an approach ... gives full recognition to the competing public and private interests ... at stake and, in so doing, best fulfills the historic purpose behind the constitutional right to be free from unreasonable government invasions of privacy."

*Id.* at 539, 87 S.Ct. at 1736 (citations omitted).

A valid public interest justifying intrusions has been amply identified in the field of foreign intelligence surveillance. Indeed, the court, in *Truong,* found the public interest in this area to be so strong that even the imposition of a uniform warrant requirement would "unduly frustrate" the President in carrying out his foreign affairs responsibilities. *Truong,* 629 F.2d at 913. Moreover, the particular warrant used in this case is of even narrower scope than the general foreign intelligence warrant contemplated in *Truong,* since it was limited to a surveillance to gather information relevant to an effort to protect the United States from international terrorism. Defendants indeed appear to acknowledge the reasonableness of these objectives by arguing that the surveillance "warrants" issued pursuant to FISA do not meet the *Camara*

definition of "probable cause" not because of their invalid purposes but because the role of FISC and the court reviewing the FISC determination is too limited and because the scope of the FISA warrant is broader than necessary to accomplish these legitimate purposes. However, the analysis of the Act detailed above reveals that defendants' assertions in this respect are unfounded.

Under FISA, the FISC judge makes those determinations which he is competent to make as a member of the judiciary, namely, (1) whether there is probable cause to believe that the surveillance is directed against a foreign power and that the place at which the surveillance is being directed is a place being used by a foreign power; (2) the appropriate limits on the warrant in terms of time and disclosure of information acquired; and (3) whether the determinations within the competence of the executive branch to make, i.e., that the information relates to or is necessary to carry out certain specified foreign policy objectives, have, in fact, been made by the appropriate officials of the executive branch. The FISC judge makes determinations, in other words, with regard to the time, person, and place at which the surveillance is directed in order to decide whether the stated purposes of the executive branch will be served by the warrant sought. While he does not decide, except where the target of the surveillance is a "U.S. person," whether the executive branch's judgment as to the foreign policy decision to authorize the surveillance is correct or incorrect, he does require that foreign policy decision be made and

---

**13.** For example, in *Camara,* the Court sought to determine the precise nature of the "cause" that needed to be shown to justify the issuance of search warrants in connection with a municipal housing code enforcement inspection program and stated:

> "Unlike the search pursuant to a criminal investigation, the inspection programs at issue here are aimed at securing city-wide compliance with minimum physical standards for private property. The primary governmental interest at stake is to prevent even the unintentional development of conditions which are hazardous to public health and safety. Because fires and epidemics may

ravage large urban areas, because unsightly conditions adversely affect the economic values of neighboring structures, numerous courts have upheld the police power of municipalities to impose and enforce such minimum standards even upon existing structures. *In determining whether a particular inspection is reasonable—and thus in determining whether there is probable cause to issue a warrant for that inspection—the need for the inspection must be weighed in terms of these reasonable goals of code enforcement.*" 387 U.S. at 535, 87 S.Ct. at 1734 (emphasis added).

articulated as a prerequisite to issuance of a warrant. While the role of the FISC judge and the standards for issuance of the FISA warrant differ from the role of a judge issuing warrants designed to gather evidence for civil or criminal law enforcement, the differences appear reasonably adapted to the peculiarities of foreign intelligence gathering, as detailed in the legislative history, including the interests of national security that are at stake, the appropriate roles of the executive and the judiciary in the area of foreign policy, and the extraordinary complexities of the field in which the information is to be acquired.

### 2. Fifth Amendment Issues

■ Defendants also argue that employment of FISA to gather evidence of a crime violates their fifth amendment due process rights. First, they argue that only the products of a surveillance conducted pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 et seq., can be used against them in a criminal trial.[14] Defendants' premise in this regard is that Title III was intended by Congress to govern the authorization of electronic surveillance in criminal investigations to the exclusion of all other modes of authorization and that Title III sets the minimum constitutional standard by which telephone conversations may be lawfully seized. In this connection, defendants cite 28 U.S.C. § 2516(2), which has been interpreted to mean that states may enact wiretapping statutes that are more restrictive than Title III, but that Title III sets the minimum requirements for all wiretapping and that none may permit wiretapping on a basis less restrictive than Title III. See United States v. Upton, 502 F.Supp. 1193 (D.N.H.1980); People v. Shapiro, 50 N.Y.2d 747, 431 N.Y.S.2d 422, 409 N.E.2d 897 (1980). See also U.S.Code Cong. & Admin. News, 2112 at 2187 (1968).[15]

It is not accurate, however, to say that Title III sets the minimum constitutional standard by which telephone conversations may be lawfully seized in all cases. In Keith, the Supreme Court expressly stated that Title III "does not attempt to define or delineate the powers of the President to meet domestic threats to the national security." 407 U.S. at 322, 92 S.Ct. at 2139. The Court added:

"Moreover, we do not hold that the same type of standards and procedures prescribed by Title III are necessarily applicable to [domestic national security cases] .... [T]he focus of domestic surveillance may be less precise than that directed against more conventional types of crime. Given these potential distinctions between Title III criminal surveillance and those involving the domestic security, Congress may wish to consider protective standards for the latter which differ from those already prescribed for specific crimes in Title III. *Different standards may be compatible with the Fourth Amendment if they are reasonable both in relation to the legitimate need of Government for intelligence information and the protected rights of our citizens.*"

Id. at 322–23, 92 S.Ct. at 2139–40 (emphasis added). Thus, Title III is not the minimum constitutional standard by which telephone conversations may be seized in all cases.

With respect to defendants' suggestion that Title III was intended by Congress as the exclusive means of securing evidence by electronic surveillance for use in criminal investigations, Congress, as already noted, clearly contemplated the use of the fruits of FISA surveillance in criminal proceedings. While the use of such fruits is indeed permissible only if foreign intelligence surveillance was the Government's primary purpose with respect to the investigation as a whole, under both FISA itself and the *Truong* standards, I conclude, in light of my

---

14. In this connection it should be noted that Congress has specifically exempted from Title III conversations intercepted pursuant to FISA. 18 U.S.C. § 2511(e) and (f).

15. Defendants are correct in their assertion that 20 U.S.C. § 2516(2) mandates that Title III sets the minimum standards for wiretapping by the states, but this by no means indicates that Title III sets the minimum constitutional standards in this case.

*ex parte* review of the relevant documents, that the purpose of the surveillance in this case, both initially and throughout, was to secure foreign intelligence information and was not, as defendants assert, primarily directed towards criminal investigation or the institution of a criminal prosecution.

### 3. *Sixth Amendment Issues*

■ Defendants argue that the fruits of the FISA surveillance should be suppressed unless the court disregards § 1806(f) of the Act and permits a full adversarial evidentiary hearing on the propriety of that surveillance. As noted above, § 1806(f) of FISA provides that, when a motion to suppress the fruits of an FISA surveillance is made, the court shall, if the Attorney General files an affidavit under oath that disclosure of an adversary hearing would harm the national security, review *in camera* and *ex parte* the application, order, and such other materials relating to the surveillance as may be necessary to determine whether the surveillance was lawfully conducted and that, in making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance "only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).

The Acting Attorney General has filed such an affidavit pursuant to which the United States Attorney has petitioned this Court to determine the legality of the FISA surveillance on an *ex parte, in camera* basis. Defendants submit that such an *ex parte, in camera* suppression proceeding would violate their sixth amendment rights to competent counsel, a public trial, their presence at every stage of their trial, and confrontation and that a full adversarial hearing must be conducted since it is the most reliable method of determining the legality of the surveillance in this case.

As Judge McLaughlin noted in *Falvey, supra,* in response to the identical argument, "[w]hatever appeal this argument may have, it ignores the massive body of the pre-FISA case law of the Supreme Court, this Circuit and [other courts]" that the legality of electronic surveillance can be determined on an *ex parte, in camera* basis. 540 F.Supp. at 1315, citing *Giordano v. United States,* 394 U.S. 310, 314, 89 S.Ct. 1163, 1165, 22 L.Ed.2d 297 (1969) (Stewart, J., concurring); *Taglianetti v. United States,* 394 U.S. 316, 317, 89 S.Ct. 1099, 1100, 22 L.Ed.2d 302 (1969) (per curiam); *United States v. Ajlouny,* 629 F.2d 830, 839 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *Zweibon v. Mitchell,* 516 F.2d 594, 606 n. 14 (D.C.Cir.1975); *United States v. Butenko, supra,* 494 F.2d at 607; *United States v. Brown, supra,* 484 F.2d at 425. As the U.S. Court of Appeals for this Circuit has noted:

> "The Supreme Court has not yet decided what procedure the district courts are to follow in making threshold determinations concerning the lawfulness of electronic surveillance.... The Court has suggested, however, that adversary proceedings and full disclosure are not necessarily required 'for resolution of every issue raised by an electronic surveillance.' ... *To the contrary, such protections will not be required when the task is such that in camera procedures will adequately safeguard the defendants' fourth amendment rights.*"

*United States v. Ajlouny, supra,* 629 F.2d at 839, citing *Giordano v. United States, supra,* 394 U.S. at 314, 89 S.Ct. at 1165 (Stewart, J., concurring) and quoting and citing *Taglianetti v. United States, supra,* 394 U.S. at 317–18, 89 S.Ct. at 1100–01 (emphasis added).

In *Ajlouny,* the Court of Appeals expressly approved the use of an *ex parte, in camera* proceeding to determine the lawfulness of warrantless electronic surveillance allegedly conducted for foreign intelligence purposes, stating:

> "The issues of whether the surveillance was conducted for national security and foreign intelligence purposes and whether it was reasonable in scope were limited in nature and were not dependent on a

painstaking search through 'a large volume of factual materials.' *Alderman v. United States,* [394 U.S. 165, 183–84, 89 S.Ct. 961, 972, 22 L.Ed.2d 176]. Thus, the factors that impelled the Supreme Court to require disclosure in *Alderman* to assess whether evidence may be tainted are not present here.... We are ... convinced that accurate resolution of the factual issues would not have been materially advanced by either disclosure of information to the defendant or an adversary hearing."

*United States v. Ajlouny, supra,* 629 F.2d at 839.[16] Applying the same analysis employed by the court in *Ajlouny,* I conclude that the *ex parte, in camera* procedures provided in 50 U.S.C. § 1806(f) are constitutionally sufficient to determine the lawfulness of the electronic surveillance at issue while safeguarding defendants' fourth amendment rights. As in *Ajlouny,* the issues here are limited in nature and do not require the extensive investigation that led to the Supreme Court's decision in favor of disclosure in *Alderman.* Moreover, the principal issues which might have been raised in an attack on the lawfulness of this surveillance (aside from the completeness and regularity of the required executive branch certifications)—namely, whether the target of the surveillance was an agent of a foreign power and whether the places at which the surveillance was being directed were being used by a foreign power—are not disputed by defendants, who are, presumably, in no way hindered by the *in camera* nature of the review proceedings in disputing those necessary findings by FISC if, indeed, they were inaccurate. While the alert eye of an advocate might be helpful in discerning defects in the certificates, I see no reason to believe that an adversary proceeding is necessary for accuracy; and, in the only area in which defendants could have supplied information to complete the picture—namely, as to their position and the nature of the places at which they were under surveillance—they have not offered any information at all.

#### 4. *First Amendment and Statutory Issues*

Defendants argue that the fruits of the FISA surveillance should be suppressed on the ground that there was insufficient basis for that surveillance under the Act and that the Government may have impermissibly relied upon first amendment activities of the defendants in obtaining authorization for that surveillance.

■ Upon my review of the documents submitted to me under 50 U.S.C. § 1806(f), I find that this surveillance was authorized and conducted in conformity with the requirements of FISA and in particular that the Government's application for surveillance fully conformed to the requirements of 50 U.S.C. § 1804 and that the orders issued by the FISC judges in this matter fully conformed to the requirements of 50 U.S.C. § 1805. In this connection, for the reasons already stated, I find that further disclosure to the defendants or their counsel of the materials reviewed is not "necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f).

■ Defendants' second contention involves 50 U.S.C. § 1805(a)(3)(A), which provides that an FISC judge shall enter an order authorizing electronic surveillance if he finds, *inter alia,* that

"... on the basis of the facts submitted by the applicant there is probable cause to believe that ... the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* That no United States person may be considered a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States."

50 U.S.C. § 1805(a)(3)(A).

The sole target of the electronic surveillance authorized and conducted pursuant to FISA was defendant Gabriel Megahey,

---

**16.** The court cautioned, however, that it was not deciding "whether *ex parte, in camera* proceedings are adequate for the determination of all questions bearing upon the legality of electronic surveillance." 629 F.2d at 839 n. 12.

whose home telephone was electronically monitored. Defendant Megahey is not a "United States person," as that term is defined in the Act.[17] Accordingly, there can be no concern in this case regarding the FISA's caveat that "no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution," 50 U.S.C. § 1805(a)(3)(A), since there was no "United States person" targeted in this case. Furthermore, defendants have made no showing whatsoever to support their allegation that defendant Megahey's first amendment rights may have been abridged by the authorization or conduct of the FISA surveillance in this case.

### 5. *Minimization Issues*

■ Defendants submit that the fruits of the FISA surveillance must be suppressed due to the Government's failure to comply with the minimization procedures set forth in the FISC orders authorizing the surveillance in this case. The documents submitted to this Court pursuant to 50 U.S.C. § 1806(f) set forth in detail the minimization procedures required by the Act. These minimization procedures were approved by the Acting Attorney General and by the FISC judges who authorized the initial surveillance and its extension and are incorporated by reference in the FISC surveillance orders.

Defendants' motions to suppress the surveillance fruits on the ground of Government noncompliance with these minimization procedures are not accompanied by any showing whatsoever of such noncompliance. This failure is particularly striking in light of the fact that, pursuant to a protective order entered on October 6, 1982, defense counsel have had access to tape recordings made pursuant to all of the electronic surveillance conducted and accompanying documents such as pen register tapes and surveillance logs. Accordingly, defendants' motions to suppress on this ground is denied.

17. See n. 4, *supra*.

### 6. *Separation of Powers and Political Question Issues*

■ Defendants argue that the fruits of the FISA surveillance should be suppressed on the ground that FISA is invalid under the separation of powers and political question doctrines. They assert that courts must implement and apply the definition of "international terrorism" as set forth in 50 U.S.C. 1801(c) in reviewing certain FISA surveillance authorizations and that Congress has thereby "endowed the courts with pervasive authority to make foreign policy and, therefore, disregarded the Constitution's textual commitment of foreign policy making to the political branches. Defendants' Brief, dated Sept. 10, 1982, at 69.

As the Government's public and *in camera* submissions make apparent, the FISA definition of "international terrorism" was relied on by it in obtaining the warrant at issue here. Under 50 U.S.C. § 1805(a)(3), as a prerequisite to issuing a surveillance warrant, a FISC judge must find that there is probable cause to believe that the target of the electronic surveillance is a "foreign power" or an "agent of a foreign power." Under 50 U.S.C. § 1801(a)(4), "foreign power" means, *inter alia*, "a group engaged in international terrorism or activities in preparation therefor"; and under § 1801(b)(2)(C), "agent of a foreign power" means, *inter alia*, any person who "knowingly engages in sabotage or international terrorism, or activities that are in preparation therefor or on behalf of a foreign power."

Section 1801(c) defines "international terrorism" as activities that—

"(1) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or any State;

"(2) appear to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or (C) to affect the conduct of a government by assassination or kidnapping; and

"(3) occur totally outside the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to coerce or intimidate, or the locale in which their perpetrators operate or seek asylum."

The crux of the defendants' assertions in this regard is that, in applying the Act's definition of "international terrorism" in the course of reviewing the FISC's determination that the target of the surveillance in this area was a "foreign power" or an "agent of a foreign power" under the Act, this Court will be forced to "indulge in delicate, political questions fraught with *foreign policy interpretations and permutations*" since "[o]ne man's terrorist is another man's freedom fighter and national liberation[,] and the restoration of nationhood to the people is always a violent phenomenon." Defendants' Brief at 71.

Assuming the validity of defendants' assertion that a statute that called upon the judiciary to determine foreign policy questions would be deemed unconstitutional under the separation of powers doctrine, such concerns are not raised by this Act. The definition of international terrorism set forth in § 1801(c) calls for objective determinations as to whether certain activities involve "violent acts" or "acts dangerous to human life" that either violate American criminal laws or would so violate such laws if committed within U.S. jurisdiction and appear to be intended "to intimidate or coerce a civilian population," or "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by assassination or kidnapping" and occur outside this country or transcend national boundaries in terms of their means of accomplishment, their targets, or the locale in which their perpetrators operate or seek asylum. These terms hardly call for delicate or sensitive political

determinations fraught with foreign policy implications. Rather, they call for findings of objective fact not unlike those made in courtrooms every day.

**7. *Article III Issues***

Defendants assert that the fruits of the FISA surveillance should be suppressed because the composition and procedures of FISC are inconsistent with constitutional requirements with regard to the judicial branch.

■ First, defendants argue that FISC is not constitutionally authorized, because it receives applications and issues orders solely on an *ex parte* basis without any adversarial proceedings. While acknowledging that courts often conduct *ex parte* proceedings, as in the case of Title III wiretap applications, see 18 U.S.C. § 2518(3), they question whether a court can conduct only *ex parte* proceedings and still be properly constituted in light of the Article III case or controversy requirements. In addition, defendants contend that the structure of FISC robs the judges who sit on it of their judicial independence, making FISC a "rubber stamp."

Judge McLaughlin dismissed a similar argument in *Falvey, supra,* 540 F.Supp. at 1313 n. 16. Nor do I see any basis for concluding that a court exercising exclusively *ex parte* powers is constitutionally improper because of the case or controversy jurisdictional requirement inherent in Article III. *See Evans v. Lynn,* 537 F.2d 571, 590–91 (2d Cir.), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1976). A "case" arises within the meaning of Section 2 of Article III, when any question respecting the Constitution, treaties or laws of the United States has assumed 'such a form that the judicial power is capable of acting on it,' ... and there must be an actual controversy over an issue, not a desire for an abstract declaration of law.... *The form of the proceeding is not significant. It is the nature and effect which is controlling.*" *In re Summers,* 325 U.S. 561, 566–67, 65 S.Ct. 1307, 1310–11, 89 L.Ed. 1795 *reh. denied,* 326 U.S. 807, 66 S.Ct. 94, 90 L.Ed. 491 (1945) (citations omitted) (emphasis added).

Applications for electronic surveillance submitted to FISC pursuant to FISA involve concrete questions respecting the application of the Act and are in a form such that a judge is capable of acting on them, much as he might otherwise act on an *ex parte* application for a warrant. In the case of each application, the FISC judge is statutorily obliged to ensure that each statutory prerequisite is met by the application before he may enter a surveillance order. The FISC judge who is faced with a surveillance application is not faced with an abstract issue of law or called upon to issue an advisory opinion, but is, instead, called upon to ensure that the individuals who are targeted do not have their privacy interests invaded, except in compliance with the detailed requirements of the statute.

 Defendants further argue that the establishment of FISC is unconstitutional with respect to the judges who sit on the court, alleging that FISA violates Article III provisions regarding judicial tenure and compensation. Defendants' assertions are based on 50 U.S.C. § 1803(a) and § 1803(d), which provide that the Chief Justice of the United States shall designate seven district courts judges to sit as FISC for a maximum of seven years. They submit that, since FISC judges are appointed for a finite term of years and receive no extra compensation for their FISC duties, FISA violates Section I of Article III of the Constitution, which provides that United States judges shall hold their offices during good behavior and shall receive compensation which shall not be diminished during their tenure.

The FISC is wholly composed of United States District Court judges, appointed for life by the President with the advice and consent of the Senate, whose salaries cannot be reduced during their tenure. 50 U.S.C. § 1803(a) and (b). As such, with respect to their assignment to FISC for a seven-year term with no additional compensation, FISC judges do not differ from other federal judges who sit from time to time and when the need arises on courts other than that to which they are appointed by temporary designation pursuant to 28

U.S.C. §§ 291–293, or federal judges who sit as members of a three-judge court pursuant to 28 U.S.C. § 2284 for the duration of a given case, or the seven federal judges who are designated by the Chief Justice "from time to time" to sit on the judicial panel on multidistrict litigation pursuant to 28 U.S.C. § 1407(d), or federal judges who sit as members of the Temporary Emergency Court of Appeals to hear appeals involving only one statute, the Economic Stabilization Act of 1970, and who are designated by the Chief Justice, who may, "from time to time, designate additional judges ... and revoke previous designations," 85 Stat. 743, 749, § 211(b)(1), note following 12 U.S.C. § 1904, or federal judges who sit as members of the Special Court under the Regional Rail Reorganization Act pursuant to 45 U.S.C. § 719. All are federal judges who, pursuant to statutes, are appointed to serve on an alternate, often specialized judicial panel for finite terms and with no additional compensation for this alternate service. Defendants' valid assertion that FISC was created with the hope that FISC judges would develop expertise in the field of foreign intelligence surveillance does not distinguish FISC at all from many of these special judicial panels and does not render its status as a special panel of federal judges with finite terms constitutionally suspect.

 Finally, defendants argue that FISA forces FISC and courts reviewing FISC decisions to make purely political determinations and adjudicate political questions, contrary to longstanding doctrine under which such matters are deemed nonjusticiable.

The standards for determining what constitutes a nonjusticiable political question were set by the Supreme Court in *Baker v. Carr:*

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the

surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Yet, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Id.* at 211, 82 S.Ct. at 706. As Justice Brennan emphasized:

"Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches of its susceptibility to judicial handling in the light of its nature and posture in the specific case and the possible consequences of judicial action."

*Id.* at 211–12, 82 S.Ct. at 706–07.

Defendants' arguments in this connection respecting the Act's definition of "international terrorism" have been discussed above. I find nothing in the remainder of the Act as applied in this case that raises questions falling within the *Baker v. Carr* standards for political questions. The Act merely directs judges to make findings regarding the time, persons, and places at which the surveillance is directed and regarding governmental compliance with the procedures of the Act, in accordance with objective definitions provided within the Act itself. The determinations to be made are not unlike determinations of fact and law made throughout the judicial process in a wide variety of other contexts. See Note,

*The Foreign Intelligence Surveillance Act: Legislating a Judicial Role in National Security Surveillance,* 78 Mich.L.Rev. 1116, 1144–48 (1980).

Nor does the resolution of any questions raised by the FISA warrant application "demand that a court move beyond areas of judicial expertise" and deal with judicially unmanageable standards. *Goldwater v. Carter,* 444 U.S. 996, at 998, 100 S.Ct. 533, at 534, 62 L.Ed.2d 428 (Powell, J., concurring). The questions to be considered under FISA with respect to the particular surveillance application are not judicially unmanageable, but instead, call for traditional judicial analysis and findings. *See* Note, *Foreign Intelligence Surveillance Act, supra* at 1149–50. Nor do "prudential considerations counsel against judicial intervention" in this matter, *Goldwater v. Carter, supra,* at 998, 100 S.Ct. at 534, particularly in light of the fact that the specific judicial activity authorized by FISA was carefully considered, drafted, and approved by Congress and the executive. So too, activity undertaken pursuant to that authorization cannot be said to express "lack of the respect due coordinate branches of government" or to involve "an unusual need for unquestioning adherence to a political decision already made or the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Baker v. Carr, supra* 369 U.S. at 217, 82 S.Ct. at 710. *See* Note, *supra* at 1150–51.

### 8. *Aliens' Due Process Rights Issues*

Defendants argue that the fruits of the FISA surveillance should be suppressed because the Act unconstitutionally denies due process to aliens as a result of provisions that establish different surveillance authorization requirements depending upon whether or not the designated target is a "United States person," as that term is defined in 50 U.S.C. § 1801(i).[18] This distinction appears in at least six different provisions in the Act. First, the definition of the term "agent of a foreign power" set

---

18. *See* n. 4, *supra.*

forth in § 1801(b) is broader for non-United States persons than it is for United States persons. 50 U.S.C. § 1801(b)(1) and (2). Second, the definition of "foreign intelligence information" as set forth in 50 U.S.C. § 1801(e) varies, in that, if a "United States person" is involved, the information must be certified to be necessary to the nation's ability to protect against attack, hostile acts, sabotage, and the like; whereas if only a "non-United States person" is involved, the information need only relate to these concerns. 50 U.S.C. § 1801(e)(1) and (2). Third, 50 U.S.C. § 1805(a)(3) provides that before an FISC judge can issue a surveillance order, he must find that "the target of the electronic surveillance is a foreign power or an agent of a foreign power: *Provided,* that no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States." Fourth, 50 U.S.C. § 1805(a)(5) provides that the FISC judge must find that the filed surveillance application "contains all statements and certifications required by section 1804 ... and, if the target is a United States person, the certification or certifications are not clearly erroneous on the basis of" various statements made therein. Fifth, whether or not the target is a "United States person" will determine the duration for which an FISA surveillance order may be extended. 50 U.S.C. § 1805(d)(2). Finally, the classification of an individual as a "United States person" may determine the applicability of various provisions concerning minimization procedures, 50 U.S.C. § 1801(h), and the use and disclosure of the fruits of FISA surveillance, 50 U.S.C. § 1806(a).

Defendants argue that these provisions of the Act violate the due process rights of aliens because they are not accorded the same treatment as "United States persons." Defendants assert that "[i]n order to justify surveillance of a non-United States person, the government need not establish any probable cause whatsoever to believe that such person is engaged in any criminal activity"; but that, "[i]f the target of surveillance is a United States person, such a test must be met." Defendants' Brief at 115. This assertion is inaccurate. As discussed above, FISA does not require such a showing of probable cause of involvement in criminal activity with respect to either category; and in fact, this is one of the bases on which defendants attack the Act's constitutionality under the fourth amendment.

While defendants are certainly correct in their assertion that the fourth and fifth amendments protect aliens in the United States, *Abel v. United States,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Supreme Court has emphasized that:

> "[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification. For a host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other; and the class of aliens is itself a heterogeneous multitude of persons with a wide-ranging variety of ties to this country."

*Mathews v. Diaz,* 426 U.S. at 78–79, 96 S.Ct. at 1890–1891. The Court added, with respect to the constitutional implications of treating aliens and United States persons in different ways:

> "For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the

Judiciary.... Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution."

426 U.S. at 81, 96 S.Ct. at 1892. Thus, the Court has adopted a stance of minimal scrutiny respecting federal regulations that contain alienage-based classifications. *Id.* at 82–84, 96 S.Ct. at 1892–1893.

It should be emphasized that the distinct treatment accorded aliens under FISA does not affect all aliens, but only those aliens who do not fall within the definition of "United States person" set out in 50 U.S.C. § 1801(i). The phrase "United States person," in other words, includes aliens lawfully admitted for permanent residence in the United States, as defined in 8 U.S.C. § 1101(a)(20); and those aliens cannot be classified as "agents of a foreign power," as that term is defined in 50 U.S.C. § 1801(b)(1), although they can be so classified under 50 U.S.C. § 1801(b)(2). Thus, FISA contains different standards for a limited class of aliens.

The different treatment accorded aliens not lawfully admitted to permanent residence under FISA is rationally related to the Act's purposes of attempting to protect the United States against various types of acts of foreign powers and to acquire information necessary to the national defense or the conduct of foreign affairs. The lack of any demonstrated intent to reside permanently in the United States, which characterizes the group by definition, itself increases the likelihood that the government will have to act quickly before it is in a position to demonstrate that the interest is "necessary" to the protection or furtherance of United States interests or that the person is engaged in the type of subversive activities described in section 1801(b)(2), which the Act makes the hallmark of "United States persons" who have become agents of a foreign power. So, too, the relatively greater likelihood that non-resident aliens will engage in the same type of activities against which the Act seeks to protect the United States justifies the provisions of the Act permitting the government to obtain warrants on the basis of a lesser showing of need and on the basis of speech otherwise protected by the first amendment than would be required if resident aliens or United States citizens were the target of the inquiry.[19] The same increased need for prompt action and concern for the greater degree of risk or the greater likelihood that relevant information will be obtained justifies the relaxation of the minimization, duration, and anti-disclosure provisions of the Act with respect to aliens who are not legally here as permanent residents.

### CONCLUSION

Each of the arguments put forth by defendants having been rejected, their motions to suppress the fruits of the FISA surveillance conducted in this case are denied. The Government's application to have this Court determine the legality of the electronic surveillance on an *ex parte, in camera* basis pursuant to 50 U.S.C. § 1806(f) is granted. Upon my review of the relevant documents submitted by the Government, I find that the electronic surveillance was lawfully authorized and conducted.

The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

---

**19.** However, as the Government points out, while this provision means that the first amendment activities of "United States persons" cannot be used as the sole basis for deeming such an individual a "foreign power" or an "agent of a foreign power," it does not mean that the first amendment activities of non-"United States persons" can be so used if such use would deprive such persons of their first amendment rights. In all events, defendants have made no showing whatsoever that defendant Megahey was deemed a "foreign power" or an "agent of a foreign power" on the basis of activities protected by the first amendment. Nor does the Government's *in camera* submission indicate that he was.